UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

JUDGE GOTTSCHALL

02 C 6240

DOCKE

SEP 0 3

the Matter of

BANK ONE N.A..

vs.

Case Number:

ASIA PULP & PAPER COMPANY, LTD.

MAGISTRATE JUDGE
GERALDINE SOAT BROWN

PPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

Bank One N.A.

| (A) | (B) |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME James M. Crowley | NAME Jeffrey D. Corso |
| FIRM Rock, Fusco & Garvey, Ltd. | FIRM Rock, Fusco & Garvey, Ltd. |
| STREET ADDRESS 350 N. LaSalle Street, #900 | STREET ADDRESS 350 N. LaSalle Street, #900 |
| CITY/STATE/ZIP Chicago, IL 60610 | CITY/STATE/ZIP Chicago, IL 60610 |
| TELEPHONE NUMBER 312-464-3500   FAX NUMBER 312-494-6610 | TELEPHONE NUMBER 312-464-3500   FAX NUMBER 312-494-6610 |
| E-MAIL ADDRESS | E-MAIL ADDRESS |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) |
| MEMBER OF TRIAL BAR?   YES ☐   NO ☐ | MEMBER OF TRIAL BAR?   YES ☒   NO |
| TRIAL ATTORNEY?   YES ☒   NO ☐ | TRIAL ATTORNEY?   YES ☒   NO |
| | DESIGNATED AS LOCAL COUNSEL?   YES ☐   NO |

| (C) | (D) |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME Edmond M. Burke | NAME |
| FIRM Rock, Fusco & Garvey, Ltd. | FIRM |
| STREET ADDRESS 350 N. LaSalle Street, #900 | STREET ADDRESS |
| CITY/STATE/ZIP Chicago, IL 60610 | CITY/STATE/ZIP |
| TELEPHONE NUMBER 312-464-3500   FAX NUMBER 312-494-6610 | TELEPHONE NUMBER   FAX NUMBER |
| E-MAIL ADDRESS | E-MAIL ADDRESS |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) |
| MEMBER OF TRIAL BAR?   YES ☐   NO ☒ | MEMBER OF TRIAL BAR?   YES ☐   NO |
| TRIAL ATTORNEY?   YES ☐   NO ☒ | TRIAL ATTORNEY?   YES ☐   NO |
| DESIGNATED AS LOCAL COUNSEL?   YES ☐   NO ☐ | DESIGNATED AS LOCAL COUNSEL?   YES ☐   NO |

# UNITED STATES DISTRICT COURT JUDGE GOTTSCHALL
## NORTHERN DISTRICT OF ILLINOIS

# **Civil Cover Sheet**

MAGISTRATE JUDGE
GERALDINE SOAT BROW

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Th information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as require by law. This form is authorized for use only in the Northern District of Illinois.

# 02 C 6240

**Plaintiff(s): BANK ONE, N.A., successor in interest to the First National Bank of Chicago**

**Defendant(s): PI INDAH KIAT PULP AND PAPER CORPORATION, Tbk a corporation duly organized under the laws of the Republic o Indonesia; PT PABRIK KERTAS TJIWI KIMIA, Tbk, a corporation duly organized under the laws of the Republic of Indonesia; ASIA PULP AND PAPER COMPANY, LTD., a corporation duly organized under the laws of Singapore**

County of Residence: Cook

County of Residence:

Plaintiff's Atty:   James M. Crowley, Esq.
Rock, Fusco & Garvey, Ltd.
350 N. LaSalle Street, Suite
900, Chicago, Illinois 60610
(312) 464-3500

Defendant's Atty:

II. Basis of Jurisdiction:      **4. Diversity (complete item III)**

III. Citizenship of Principal
Parties **(Diversity Cases Only)**
            Plaintiff:- **4 IL corp or Principal place of Bus. in IL**
            Defendant:- **3 Citizen of Foreign Country**

**DOCKETED**

SEP 0 3 2002

IV. Origin :           **1. Original Proceeding**

V. Nature of Suit:        **190 Other Contract**

VI. Cause of Action:      **28 U.S.C. Section 1332 (a)(2). The matter in controversy exceeds th sum or value of $75,000.00, exclusive of interest and costs, and the action involves citizens or subjects of a foreign state or country.**

VII. Requested in Complaint
            Class Action: **No**
      Dollar Demand: **$24,000,000.00**
            Jury Demand: **No**

VIII. This case **IS NOT** a refiling of a previously dismissed case.

**Signature:** _____

**Date:** _____

If any of this information is incorrect, please go back to the Civil Cover Sheet Input form using the *Back* button in your browser and change it. Once correct, print this form, sign and date it and submit it with your new civil action. **Note: You may need to adjust the font size in your browser display to make the form print properly.**          Revised: 06/28/00

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| BANK ONE, NA, successor in interest to<br>The First National Bank of Chicago<br><br>Plaintiff,<br><br>v.<br><br>PT INDAH KIAT PULP AND PAPER<br>CORPORATION Tbk, a corporation duly organized<br>under the laws of the Republic of Indonesia<br>PT PABRIK KERTAS TJIWI KIMIA Tbk,<br>a corporation duly organized  under the laws of<br>the Republic of Indonesia; ASIA PULP AND<br>PAPER COMPANY, LTD., a corporation duly<br>organized under the laws of Singapore<br><br>Defendants. | ) JUDGE GOTTSCHALL<br>)<br>)<br>) MAGISTRATE JUDGE<br>) GERALDINE SOAT BROW<br>)<br>) Case No:<br>) 02 C 6240<br>)<br>)<br>) FILED SEP 0<br>) DOCK<br>) AUG 30 2002<br>)<br>) MICHAEL W DOBBINS<br>) CLERK, U.S. DISTRICT COURT |

## COMPLAINT

NOW COMES Bank One, NA, successor in interest to The First National Bank of Chicago

by its attorneys James M. Crowley, Jeffrey D. Corso and Edmund Burke, for its complaint against

Defendants PT Indah Kiat Pulp and Paper Corporation Tbk, a corporation duly organized under the

laws of the Republic of Indonesia, PT Pabrik Kertas Tjiwi Kimia Tbk, a corporation duly organized

under the laws of the Republic of Indonesia and Asia Pulp and Paper Company, Ltd., a corporation

duly organized under the laws of Singapore, states as follows:

### PRELIMINARY STATEMENT

1.      Count I of the Complaint asserts an action for breach of contract against PT Indah

Kiat Pulp and Paper Corporation Tbk, for breach of the terms and conditions of a Promissory Note

dated September 24, 1998, in the original principal amount of $26,809,962.00.  Count II of the

Complaint asserts an action against Asia Pulp and Paper Company, Ltd.,  a corporation duly

organized under the laws of Singapore, for breach of its obligations under the terms of Guaranties dated April 25, 1988 and September 24, 1998, wherein Asia Pulp and Paper Company, Ltd. unconditionally guarantees payment of all amounts due in connection with the September 24, 1998 Note executed by PT Indah Kiat Pulp and Paper Corporation Tbk. Count III of the Complaint asserts an action for breach of contract against PT Pabrik Kertas Tjiwi Kimia Tbk, for breach of the terms and conditions of a Promissory Note dated September 24, 1998, in the amount of $16,213,352.95. Count IV of the complaint asserts a cause of action against Asia Pulp for breach of its obligations under the terms of Guaranties dated April 25, 1998 and September 24, 1998, wherein Asia Pulp and Paper Company, Ltd. unconditionally guarantees payment of all amounts due in connection with the September 24, 1998 Note executed by PT Pabrik Kertas Tjiwi Kimia Tbk. Bank One is the owner by assignment of the Promissory Notes and the beneficiary of the Guaranties.

## PARTIES

2.      Plaintiff Bank One, NA, ("Bank One") is a national banking association with its principal place of business in the County of Cook, City of Chicago, State of Illinois.

3.      Defendant PT Indah Kiat Pulp and Paper Corporation ("Indah Kiat"), is a corporation duly organized under the laws of the Republic of Indonesia, with its principal place of business in Jakarta, Republic of Indonesia.

4.      Defendant PT Pabrik Kertas Tjiwi Kimia Tbk ("Tjiwi Kimia"), is a corporation duly organized under the laws of the Republic of Indonesia, with its principal place of business in Jakarta, Republic of Indonesia.

5.     Defendant Asia Pulp and Paper Company, Ltd., ("APP"), is a corporation duly organized under the laws of Singapore, with its principal place of business in the Republic of Singapore.

## JURISDICTION AND VENUE

6.     This court has jurisdiction pursuant to 28 U.S.C. § 1332 (a) (2) in that the matters in controversy exceeds the sum or value of $75,000.00, exclusive of interest or costs and the action involves citizens or subjects of a foreign state.

7.     Venue is proper under 28 U.S.C. § 1391 (d) wherein, an alien may be sued in any district. In addition, under the terms of the credit agreements which form the basis of the obligations evidenced by the Tjiwi Kimia Note and the Indah Kiat Note, the "Borrowers" Indah Kiat and Tjiwi Kimia and the "Guarantor" APP agreed that venue shall be proper in any Federal Court or Illinois State Court sitting in the City of Chicago.

## BACKGROUND

8.     On or about April 25, 1998, Indah Kiat, APP and Beloit Corporation, a corporation duly organized under the laws of the State of Delaware ("Beloit"), entered into a credit agreement ("Indah Kiat Credit Agreement") whereby Beloit extended credit in favor of Indah Kiat in the amount of $21,809,962.00 for the purpose of partially financing Indah Kiat's purchase of one Fine Paper Machine PPM3 from Beloit for the total cost of $136,729,000.00. A true and correct copy of the Indah Kiat Credit Agreement is attached hereto and made a part hereof as Exhibit "A".

9.     Under the terms of the Indah Kiat Credit Agreement, APP agreed to unconditionally guarantee payment of all obligations of Indah Kiat under the terms of the Indah Kiat Credit

Agreement and any document or note evidencing the extension of credit in favor of Indah Kiat arising under the Indah Kiat Credit Agreement and further agreed to waive, among other things, notice of demand and presentment.

10.     To evidence the obligations of Indah Kiat under the Indah Kiat Credit Agreement, on or about April 25, 1998, Indah Kiat executed and delivered to Beloit a Promissory Note dated April 25, 1998 in the original principal amount of $21,809,962.00 (United States dollars) (the "$21,809,962 Indah Kiat Note"). A true and correct copy of the $21,809,962.00 Indah Kiat Note is attached hereto and made a part hereof as Exhibit "B".

11.     On or about April 25, 1998, and in consideration of Beloit extending credit to Indah Kiat for the purpose of partially financing Indah Kiat's purchase of one Fine Paper Machine PPM3 from Beloit, APP executed and delivered to Beloit, the Guarantee on the $21,809,962.00 Indah Kiat Note, unconditionally guaranteeing payment of all obligations of Indah Kiat arising under the $21,809,962.00 Indah Kiat Note.

12.     On or about April 25, 1998, Tjiwi Kimia, APP and Beloit Corporation, entered into a credit agreement ("Tjiwi Kimia Credit Agreement") whereby Beloit extended credit in favor of Tjiwi Kimia in the amount of $16,213,352.95 for the purpose of partially financing Tjiwi Kimia' purchase of one Fine Paper Machine MPM11 from Beloit for the total cost of $136,729,000.00. A true and correct copy of the Tjiwi Kimia Credit Agreement is attached hereto and made a part hereof as Exhibit "C".

13.     Under the terms of the Tjiwi Kimia Credit Agreement, APP agreed to unconditionally guarantee payment of all obligations of Tjiwi Kimia under the terms of the Tjiwi Kimia Credit

Agreement and any document or note evidencing the extension of credit in favor of Tjiwi Kimia arising under the Tjiwi Kimia Credit Agreement and further agreed to waive, among other things, notice of demand and presentment.

14.     To evidence the obligations of Tjiwi Kimia under the Tjiwi Kimia Credit Agreement, on or about April 25, 1998, Tjiwi Kimia executed and delivered to Beloit a Promissory Note dated April 25, 1998 in the original principal amount of $16,213,352.95 (United States dollars) (the "$16,213,352.95 Tjiwi Kimia Note"). A true and correct copy of the $16,213,352.95 Tjiwi Kimia Note is attached hereto and made a part hereof as Exhibit "D".

15.     On or about April 25, 1998, and in consideration of Beloit extending credit to Tjiwi Kimia for the purpose of partially financing Tjiwi Kimia's purchase of one Fine Paper Machine MPM111 from Beloit, APP executed and delivered to Beloit, the Guarantee on the $16,213,352.95 Tjiwi Kimia Note, unconditionally guaranteeing payment of all obligations of Tjiwi Kimia arising under the $16,213,325.95 Tjiwi Kimia Note.

16.     On or about April 25, 1998, Beloit Corporation and The First National Bank of Chicago, predecessor in interest to Bank One ("Bank One"), entered into a certain Note Purchase Agreement (the "Purchase Agreement") whereby Beloit sold to Bank One and Bank One purchased from Beloit all right, title and interest of Beloit under the April 25, 1998 Indah Kiat Note and the April 25, 1998 Tjiwi Kimia Note. A true and correct copy of the Purchase Agreement is attached hereto and made a part hereof as Exhibit "E". In accordance with the obligations of Beloit under the Purchase Agreement, Beloit executed and delivered to Bank One, a certain Form of Notice and

Endorsement ("Endorsement") dated April 29, 1998, which assigned and transferred all of Beloit's right, title and interest in, to and under those Notes and the obligations evidenced thereby. A true and correct copy of the Endorsement is attached hereto as Exhibit "F".

17.    On or about September 24, 1998, and pursuant to a certain Amendment to Credit Agreement of Indah Kiat, APP and Beloit, the Indah Kiat Credit Agreement was amended to increase the amount of credit being extended by Beloit to Indah Kiat from $21,809,962.00 to $26,701,678.00 in lawful currency of the United States. A true and correct copy of the Amendment to Credit Agreement ("Indah Kiat Amendment") is attached hereto and made a part hereof as Exhibit "G". Under the terms of the Indah Kiat Amendment, APP acknowledged, agreed and confirmed that the obligations of Indah Kiat under the Indah Kiat Agreement, as amended by the Indah Kiat Amendment, remained unconditionally guaranteed by APP.

18.    On or about September 24, 1998, Indah Kiat executed and delivered to Beloit, a certain Promissory Note dated September 24, 2998, in the principal amount of $26,701,678.00, in lawful currency of the United States (the "Indah Kiat Note"). A true and correct copy of the Indah Kiat Note is attached hereto and made a part hereof as Exhibit "H". On or about September 24, 1998, and in consideration of Beloit increasing the amount of its extension of credit to Indah Kiat to $26,701,678.00, APP executed and delivered to Beloit, the Guarantee on the Indah Kiat Note, unconditionally guaranteeing payment of all obligations of Indah Kiat arising thereunder. The Indah Kiat Note of September 24, 1998, replaced and superceded the $21,809,962.00 Indah Kiat Note.

19.    On or about September 24, 1998, and pursuant to a certain Amendment to Credit Agreement of Tjiwi Kimia, APP and Beloit, the Tjiwi Kimia Credit Agreement was amended to

-6-

increase the amount of credit being extended by Beloit to Tjiwi Kimia from $16,213,352.95 t

$17,123,488.95, in lawful currency of the United States. A true and correct copy of the Amendmen

to Credit Agreement ("Tjiwi Kimia Amendment") is attached hereto and made a part hereof a

Exhibit "I". Under the terms of the Tjiwi Kimia Amendment, APP acknowledged, agreed an

confirmed that the obligations of Tjiwi Kimia under the Tjiwi Kimia Agreement, as amended by th

Tjiwi Kimia Amendment, remained unconditionally guaranteed by APP.

       20.     On or about September 24, 1998, Tjiwi Kimia executed and delivered to Beloi

a certain Promissory Note dated September 24, 1998, in the principal amount of $17,123,488.95, i

lawful currency of the United States (the "Tjiwi Kimia Note"). A true and correct copy of the Tjiw

Kimia Note is attached hereto and made a part hereof as Exhibit "J". On or about September 24

1998, and in consideration of Beloit increasing the amount of its extension of credit to Tjiwi Kimi

to $17,123,488.75, APP executed and delivered to Beloit, the Guarantee on the Tjiwi Kimia Note

guaranteeing payment of all obligations of Tjiwi Kimia arising thereunder. The Tjiwi Kimia Note o

September 24, 1998, replaced and superceded the $16,213,325.95 Tjiwi Kimia Note.

       21.     On or about September 30, 1998, Beloit and Bank One entered into a certai

Amendment No. 1 to Note Purchase Agreement ("Note Purchase Amendment"), modifying the term

of the Purchase Agreement to delete references to the original principal balances of the notes in favo

of Beloit and inserting in their place, the increased balances of the Indah Kiat Note and the Tjiw

Kimia Note. A true and correct copy of the Note Purchase Amendment, is attached hereto and mad

a part hereof as Exhibit "K". In accordance with its obligations under the Note Purchas

Amendment, Beloit executed and delivered to Bank One that certain Form of Notice an

Endorsement, dated September 30, 1998, which assigned and transferred all of Beloit's right, title and interest in, to and under those Notes and the obligations evidenced thereby. A true and correct copy of the September 30, 1998 Form of Notice and Endorsement, is attached hereto as Exhibit "L".

## COUNT I
## BREACH OF CONTRACT

NOW COMES Bank One, NA, complaining against Defendant PT Indah Kiat Pulp and Paper Corporation Tbk, a corporation duly organized under the laws of the Republic of Indonesia ("Indah Kiat"), states as follows:

1-21.  Bank One adopts and realleges paragraphs 1-21 above, as paragraphs 1-21 of Count I of its Complaint against Indah Kiat.

22.  In addition, under the terms of the Indah Kiat Note, Indah Kiat was obligated to make principal reduction payments in eight installments, the first installment in the amount of $1,444,604.00, the next two installments in the amount of $1,348,010.00, with the final six installments in the amount of $3,984,844.00. The first installment was due September 30, 1999, with all other installments to be paid semi annually thereafter until the Indah Kiat Note was paid in full.

23.  Under the terms of the Indah Kiat Credit Agreement and Indah Kiat Note, Indah Kiat was obligated to make interest payments on the outstanding balance of the Indah Kiat Note on a semi annual basis, with the first payment due September 30, 1998 and semi annually thereafter.

24.  Notwithstanding the terms of the Indah Kiat Credit Agreement and Indah Kiat Note, Indah Kiat failed to pay Bank One the mandatory payment of principal and interest due on the Note on April 2, 2001, and has further failed to make all payments due thereafter.

25.     Based on the terms of the Credit Agreement and the Indah Kiat Note, failure to pay any principal or interest payments when due was an event of default which caused the Indah Kiat Note to automatically mature and caused the whole amount of the unpaid principal and accrued interest, to become immediately due and payable, without notice.  In addition, under the terms of the Indah Kiat Note, Indah Kiat and any guarantor of the Indah Kiat Note, waived presentment, demand and notice of protest of any kind.

26.     On September 14, 2001, Bank One sent notice to Indah Kiat advising Indah Kiat that based on its failure to make the April 2, 2001, principal and interest payment, it was in default and the Indah Kiat Note had matured.   A true and correct copy of the notice from Bank One to Indah Kiat is attached hereto and made a part hereof as Exhibit "M".  The September 14, 2001 notice from Bank One to Indah Kiat  further declared all unpaid principal and accrued interest on the Indah Kiat Note, as well as all other amounts due in respect of the Indah Kiat Note and the Indah Kiat Credit Agreement, immediately due and payable.

27.     Bank One has performed all of its obligations, if any, under the Indah Kiat Credit Agreement and Indah Kiat Note.

28.     Since October 11, 2000, no payments have been made by Indah Kiat, or any other party to satisfy the amounts due under the Indah Kiat Credit Agreement or Indah Kiat Note, which amounts remain due and payable.

29.     After credit for all payments received by Bank One, as of July 31, 2002, the amount of $14,789,961.57, excluding attorney's fees and costs, is due under the Indah Kiat Note.  Interest continues to accrue on the unpaid balance of the Indah Kiat Note at the default rate, as set forth in

the Indah Kiat Note and the Indah Kiat Credit Agreement.

30. Under the terms of the Indah Kiat Credit Agreement, Indah Kiat agreed to pay Bank One all amounts incurred in enforcing its rights under the Indah Kiat Credit Agreement and Indah Kiat Note, including attorney's fees and other costs.

WHEREFORE, Bank One, NA, respectfully requests this court enter judgment in favor of Bank One, NA, and against PT Indah Kiat Pulp and Paper Corporation Tbk, a corporation duly organized under the laws of the Republic of Indonesia in the amount of $14,789,961.57, as of July 31, 2002, with interest thereafter at the default rate set forth in the Indah Kiat Note and Indah Kiat Credit Agreement, plus attorney's fees, costs and any and all other amounts due or incurred by Bank One in enforcing its rights under the Indah Kiat Credit Agreement and Indah Kiat Note, and for such other relief as this court deems just and equitable.

## COUNT II
## BREACH OF CONTRACT

NOW COMES the Plaintiff, Bank One, NA, and complaining of the Defendant Asia Pulp and Paper Corporation, a corporation duly organized under the laws of Singapore ("APP"), states as follows:

1-30. Bank One adopts and realleges paragraphs 1-30 of Count I of its Complaint, as paragraphs 1-30 of Count II of its Complaint against Asia Pulp and Paper Company.

31. Under the terms of the Indah Kiat Credit Agreement and Indah Kiat Note, APP unconditionally guaranteed the prompt and complete payment of all principal and interest due in connection with the Indah Kiat Note, when due in accordance with its terms.

32.     On September 14, 2001, Bank One sent notice to APP advising APP that based on the failure to make the April 2, 2001, principal and interest payment, the Indah Kiat Note had matured and that APP was in default of its obligations under its guaranties on the Indah Kiat Note and in the Indah Kiat Credit Agreement (the "Indah Kiat Guaranties"). A true and correct copy of the notice from Bank One to APP is attached hereto and made a part hereof as Exhibit "N". The September 14, 2001 notice from Bank One to APP further declared all unpaid principal and accrued interest on the Indah Kiat Note, as well as all other amounts due in respect of the Indah Kiat Note or the Indah Kiat Credit Agreement, immediately due and payable under the Indah Kiat Guaranties.

33.     Notwithstanding the terms and conditions of the Indah Kiat Guaranties from APP, since October 11, 2000, no payments have been made by APP or any other party to satisfy the amounts due in connection with the Indah Kiat Credit Agreement and Indah Kiat Note.

34.     After credit for all payments received by Bank One, as of July 31, 2002, the amount of $14,789,961.57, excluding attorney's fees and costs, is due under the Indah Kiat Note. Interest continues to accrue on the unpaid balance of the Indah Kiat Note at the default rate, as set forth in the Indah Kiat Note and the Indah Kiat Credit Agreement. Under the terms of the Indah Kiat Guaranties, APP is liable for all of these amounts.

35.     Further, under the terms of the Indah Kiat Credit Agreement, APP agreed to pay Bank One all amounts incurred in enforcing its rights under the Indah Kiat Credit Agreement and Indah Kiat Note, including attorney's fees and other costs.

WHEREFORE, Bank One, NA, respectfully requests this court enter judgment in favor of

-11-

Bank One, NA, and against Asia Pulp and Paper Corporation, a corporation duly organized under the laws of Singapore in the amount of $14,789,961.57, as of July 31, 2002, with interest thereafter at the default rate set forth in the Indah Kiat Note and Indah Kiat Credit Agreement, plus attorney's fees, costs and any and all other amounts due or incurred by Bank One in enforcing its rights under the Indah Kiat Credit Agreement and Indah Kiat Note, and for such other relief as this court deems just and equitable.

## COUNT III
## BREACH OF CONTRACT

NOW COMES Bank One, NA, complaining against Defendant PT Pabrik Kertas Tjiwi Kimia Tbk, a corporation duly organized under the laws of the Republic of Indonesia ("Tjiwi Kimia"), states as follows:

1-21. Bank One adopts and realleges paragraphs 1-21 above, as paragraphs 1-21 of Count III of its Complaint against Tjiwi Kimia.

22. In addition, under the terms of the Tjiwi Kimia Note, Tjiwi Kimia was obligated to make principal reduction payments in eight installments, the first installment in the amount of $578,352.95, the next two installments in the amount of $635,000.00 each, with the final six installments in the amount of $2,500,000.00. The first installment was due September 30, 1999, with all other payments to be paid semi-annually thereafter until the Tjiwi Kimia Note was paid in full.

23. Under the terms of the Tjiwi Kimia Credit Agreement and Tjiwi Kimia Note, Tjiwi Kimia was obligated to make interest payments on the outstanding balance of the Tjiwi Kimia Note on a semi annual basis, with the first payment due September 30, 1998 and semi annually thereafter.

24.     Notwithstanding the terms of the Tjiwi Kimia Credit Agreement and Tjiwi Kimia Note, Tjiwi Kimia failed to pay Bank One the mandatory payment of principal and interest due on the Note on April 2, 2001, and has further failed to make all payments due thereafter.

25.     Based on the terms of the Credit Agreement and Tjiwi Kimia Note, failure to pay any principal or interest payments when due, was an event of default which caused the Tjiwi Kimia Note to automatically mature and caused the whole amount of the unpaid principal and accrued interest, to become immediately due and payable, without notice.   In addition, under the terms of the Tjiwi Kimia Note, Tjiwi Kimia and any guarantor of the Tjiwi Kimia Note, waived presentment, demand and notice of protest of any kind.

26.     On September 14, 2001, Bank One sent notice to Tjiwi Kimia advising Tjiwi Kimia that based on its failure to make the April 2, 2001, principal and interest payment, it was in default and the Tjiwi Kimia Note had matured.   A true and correct copy of the notice from Bank One to Tjiwi Kimia is attached hereto and made a part hereof as Exhibit "O".  The September 14, 2001 notice from Bank One to Tjiwi Kimia  further declared all unpaid principal and accrued interest on the Tjiwi Kimia Note, as well as all other amounts due in respect of the Tjiwi Kimia Note and the Tjiwi Kimia Credit Agreement, immediately due and payable.

27.     Bank One has performed all of its obligations, if any, under the Tjiwi Kimia Credit Agreement and Tjiwi Kimia Note.

28.     Since October 2, 2000, no payments have been made by Tjiwi Kimia, or any other party to satisfy the amounts due under the Tjiwi Kimia Credit Agreement or Tjiwi Kimia Note, which amounts remain due and payable.

-13-

29.    After credit for all payments received by Bank One, as of July 31, 2002, the amount of $9,760,863.77, excluding attorney's fees and costs, is due under the Tjiwi Kimia. Interest continues to accrue on the unpaid balance of the Tjiwi Kimia at the default rate, as set forth in the Tjiwi Kimia Note and the Tjiwi Kimia Credit Agreement.

30.    Under the terms of the Tjiwi Kimia Credit Agreement, Tjiwi Kimia has agreed to pay Bank One all amounts incurred in enforcing its rights under the Tjiwi Kimia Credit Agreement and Tjiwi Kimia Note, including attorney's fees and other costs.

WHEREFORE, Bank One, NA, respectfully requests this court enter judgment in favor of Bank One, NA, and against PT Pabrik Kertas Tjiwi Kimia Tbk, a corporation duly organized under the laws of the Republic of Indonesia in the amount of $9,760,863.77, as of July 31, 2002, with interest thereafter at the default rate set forth in the Tjiwi Kimia Note and Tjiwi Kimia Credit Agreement, plus attorney's fees, costs and any and all other amounts due or incurred by Bank One in enforcing its rights under the Tjiwi Kimia Credit Agreement and Tjiwi Kimia Note, and for such other relief as this court deems just and equitable.

## COUNT IV
## BREACH OF CONTRACT

NOW COMES the Plaintiff, Bank One, NA , and complaining of the Defendant Asia Pulp and Paper Corporation, a corporation duly organized under the laws of Singapore ("APP"), states as follows:

1-30.    Bank One adopts and realleges paragraphs 1-30 of Count III of its Complaint, as paragraphs 1-30 of Count IV of its Complaint against Asia Pulp and Paper Company.

31.    Under the terms of the Tjiwi Kimia Credit Agreement and Tjiwi Kimia Note, APP

-14-

unconditionally guaranteed the prompt and complete payment of all principal and interest due in connection with the Tjiwi Kimia Note, when due in accordance with its terms.

32.     On September 14, 2001, Bank One sent notice to APP advising APP that based on the failure to make the April 2, 2001, principal and interest payment, the Tjiwi Kimia Note had matured and that APP was in default of its obligations under its guaranties on the Tjiwi Kimia Note and in the Tjiwi Kimia Credit Agreement (the "Tjiwi Kimia Guaranties"). A true and correct copy of the notice from Bank One to APP is attached hereto and made a part hereof as Exhibit "P". The September 14, 2001 notice from Bank One to APP further declared all unpaid principal and accrued interest on the Tjiwi Kimia Note, as well as all other amounts due in respect of the Tjiwi Kimia Note and the Tjiwi Kimia Credit Agreement, immediately due and payable under the Tjiwi Kimia Guaranties.

33.     Notwithstanding the terms and conditions of the Tjiwi Kimia Guaranties from APP, since October 2, 2000, no payments have been made by APP or any other party to satisfy the amounts due in connection with the Tjiwi Kimia Credit Agreement and Tjiwi Kimia Note.

34.     After credit for all payments received by Bank One, as of July 31, 2002, the amount of $9,760,863.77, excluding attorney's fees and costs, is due under the Tjiwi Kimia Note. Interest continues to accrue on the unpaid balance of the Tjiwi Kimia Note at the default rate, as set forth in the Tjiwi Kimia Note and the Tjiwi Kimia Credit Agreement. Under the terms of the Tjiwi Kimia Guaranties, APP is liable for all of these amounts.

35.     Further, under the terms of the Tjiwi Kimia Credit Agreement, APP agreed to pay Bank One all amounts incurred in enforcing its rights under the Tjiwi Kimia Credit Agreement and Tjiwi Kimia Note, including attorney's fees and other costs.

WHEREFORE, Bank One, NA, respectfully requests this court enter judgment in favor of Bank One, NA, and against Asia Pulp and Paper Corporation, a corporation duly organized under the laws of Singapore in the amount of $9,760,863.77, as of July 31, 2002, with interest thereafter at the default rate set forth in the Tjiwi Kimia Note and Tjiwi Kimia Credit Agreement, plus attorney's fees, costs and any and all other amounts due or incurred by Bank One in enforcing its rights under the Tjiwi Kimia Credit Agreement and the Tjiwi Kimia Note, and for such other relief as this court deems just and equitable.

Bank One, NA

By: _____

JAMES M. CROWLEY, ESQ.
JEFFREY D. CORSO, ESQ.
EDMUND BURKE, ESQ.
350 NORTH LASALLE STREET
SUITE 900
CHICAGO, ILLINOIS 60610
(312) 464-3500

# EXHIBIT
# A

# CREDIT AGREEMENT

THIS CREDIT AGREEMENT (the "Agreement"), dated as of _April 25_, 1998 by and between Pulp & Paper Corporation Tbk, a corporation duly organized under the laws of the Republic of In "Borrower"), Asia Pulp & Paper Company Ltd., a corporation duly organized under the laws of the Singapore (the "Guarantor"), and Beloit Corporation, a corporation duly organized under the laws of Delaware (the "Lender").

The parties hereto hereby agree as follows:

### Section 1. Certain Definitions

1.1 "Borrower" shall mean PT Indah Kiat Pulp & Paper Corporation Tbk, a corporation organiz laws of the Republic of Indonesia.

1.2 "Business Day" shall mean a day for dealings by and between banks in the London interban a day which shall be in Chicago, Singapore and Jakarta a day for dealings by and between banks in Chicago, Singapore and Jakarta other than a day they are authorized or requir close.

1.3 "Fees" shall mean all bank, insurance, and legal fees incurred in structuring and documenting

1.4 "Guarantor" shall mean Asia Pulp & Paper Company, Ltd., a corporation organized under th Republic of Singapore.

1.5 "Guarantee" shall mean the guarantee provided by the Guarantor to the Lender hereunder with Section 3.1.

1.6 "Interest Period" shall mean each period for which a particular interest rate will apply to a Lo be in all cases six months, provided, however, that the initial Interest Period shall

1.7 "Lender" shall mean Beloit Corporation and any of its successors and assigns.

1.8 "Interest Rate" shall mean for each Interest Period, the sum of 2.125% per annum and the defined hereunder.

1.9 "LIBOR Rate" shall, with respect to each Interest Period, mean the arithmetic average of the displayed on Telerate Page 3750 for US Dollar deposits in the London interbank eurodo comparable amounts with maturities comparable to the Interest Period for which such rat 11:00a.m. (local London time) two Business Days prior to the commencement of such Intere no such offered rates appear on such page, the LIBOR Rate for such Interest Period will be average of rates quoted by not less than two major banks in the London interbank market s Lender, at approximately 11:00a.m. (Local London time) two Business days prior to the fir Interest Period for such deposits of such maturity. If, by reason of circumstances affectin interbank eurodollar market generally, the Lender determines (which determination sha conclusive, absent manifest error), that the Lender cannot reasonably ascertain the LIBOR either of the means set forth herein, then the LIBOR Rate for such interest period will average of the rates quoted by not less than two major banks in the New York interbank m by the Lender, at approximately 11:00a.m. (local New York time) two Business Days prior of such Interest Period for such deposits of such maturity. The LIBOR Rate shall be ca decimal places, rounded to the next highest one hundred-thousandth (1/100,000) of one per

1.10 "Person" shall mean and include any individual, firm, corporation, partnership, unincorporated organization or association or other enterprise or any government or politi agency, department or instrumentality thereof.

1.11 "Subsidiary" shall mean each corporation or other entity of which the Borrower, directly or indi...

(a) owns more than fifty percent of (i) the stock of such corporation or entity of any class h...
under ordinary circumstances to vote for the selection of directors, or (ii) the capital or equi...
of such corporation or entity; or (b) has the power, whether by contract or otherwise...
majority of the Board of Directors or its equivalent of such corporation or entity or to direct o...
direction of the management and policies of such corporation or entity.

**Section 2.**     **Amount and Terms of Credit**

2.1 <u>The Loans</u>. Subject to and upon the terms and conditions herein set forth, the Lender agre...
loans in United States dollars (each a "Loan" and collectively, the "Loans") to the Borrower. ...
shall be extended when all conditions precedent are presented on the date of signing of this ...
(the "Effective Date") and may be prepaid in accordance with the terms hereof and shall bea...
the Interest Rate, and shall not exceed in aggregate principal amount at any one time ...
U.S.$21,809,962.00 (United States Dollars Twenty One Million Eight Hundred Nine Thou...
Hundred Sixty Two) (the "Commitment"). The Agreement expires five years from the date of ...
"Expiry Date") of the Note(s), defined hereunder in Section 2.3, <u>provided</u>, <u>however</u>, that the ...
conditions hereof shall remain in full force and effect until all Loans have been fully repaid.

2.2 <u>Purpose of Loan</u>. The Loan will partially finance the Borrower's purchase of one fine pap...
PPM3 from the Lender. The total purchase cost of this machine is approximately U.S. $136,72...

2.3 <u>Repayment of Principal: the Note(s)</u>. The Borrower's obligation to repay the principal am...
interest on the Loans shall be evidenced by promissory note(s) (the "Note(s)") of the ...
substantially in the form attached hereto as Exhibit A. The Note(s) shall (i) be entitled to the ben...
Agreement; (ii) be dated the date hereof, be in the maximum principal amount of the Commit...
payable to the order of the Lender; (iii) bear interest in the manner provided in Section 2.1; and ...
on the Expiry Date.

2.4 <u>Interest on Loans</u>

(a) <u>Interest Rates</u>. The Loans shall bear interest from the Effective Date thereof un...
(whether by acceleration or otherwise) at a rate per annum equal to the Interest Rate.

(b) <u>Interest Periods</u>. Subject to the provisions of Section 2.4, the Interest Period commenc...
disbursement date shall be for six month periods. Each Interest Period occurring afte...
Interest Period shall commence on the day on which the next preceding Interest Perio...
Each Interest Period shall be subject to the provisions of Section 2.7(b). No Interest P...
extend beyond the Expiry Date.

(c) <u>Interest Payment Dates</u>. Interest in respect of the Loans shall be payable on the expira...
each Interest Period applicable to such Loans and at maturity (whether by acce...
otherwise).

2.5 <u>Gross-up</u>. All payments made by the Borrower to the Lender under this Agreement shall be ...
and clear of and without deduction for or on account of any tax unless the Borrower is require...
make a payment subject to such deduction or withholding of tax, in which case the sum paya...
Borrower in respect of which such deduction or withholding is required to be made shall be in...
the extent necessary to ensure that, after the making of such deduction or withholding, t...
receives and retains (free from any liability in respect of such deduction or withholding) a net su...
the sum which it would have received and retained had no such deduction or withholding bee...
required to be made.

2.6 <u>Calculations</u>. Interest and all fees shall be calculated on the basis of a 360 day year on the actu...
of days elapsed.

2

2.7   Payments.

(a)   Manner and Place of Payment. All payments under this Agreement shall be made not
11:00a.m. (local time for receiving bank) on the date when due and shall be made
transferable U.S. dollars and in immediately available funds at the Lender's designa
account in the United States or for the account of such office of the Lender or any assign
Lender may from time to time direct. Any change of office for the account of such paym
not be at any cost, duties, withholding or other tax expense to the Borrower. All payme
this Agreement shall be made under all circumstances and without regard to the n
residence or domicile of the Lender and without requiring any affidavit or the fulfillme
other formality. All payments under this Agreement and the Note(s) shall be made with
or counterclaim and in such amounts as may be necessary in order that all such paym
amounts otherwise specified to be paid under this Agreement and the Note(s).

(b)   Payments Due on Saturdays, Sundays and Holidays. Whenever any payment to
hereunder or under the Note(s) shall be stated to be due on a day which is not a Busi
the due date thereof shall be extended to the next succeeding Business Day and interes
payable at the applicable rate during such extension unless the result of such extension
to cause such due date to fall in the next calendar month or after the Expiry Date, in w
the due date thereof shall be the next preceding Business Day, with consequent adju
interest charges for the number of days by which the due date is moved forward.

(c)   Prepayments. The Borrower shall have the right to prepay any Loan in whole or in pa
time and from time to time on the following terms and conditions: (i) the Borrower shal
than 9:00a.m. (local Singapore time) three Business Days preceding the date of prepaym
the Lender in writing or by facsimile of its intent to prepay such Loan: (ii) at th
prepayment the Borrower shall pay all costs and expenses (iii) at the time of prepay
Borrower shall pay all interest accrued on the amount prepaid; and (iv) all prepayments
the minimum principal amount of $1,000,000. Amounts prepaid may not be rebo
prepayment occurs anytime other than at the end of any Interest Period, then the Borrow
to compensate the Lender for any reasonable costs incurred by the Lender that are direc
from the re-deployment of funds.

(d)   Overdue Amounts. Overdue principal and, to the extent permitted by law, overdue i
respect of each Loan, shall bear interest, payable on demand, at a rate per annum whic
equal to 3.125% per annum in excess of the Interest Rate calculated on a day's elap
pro rata for successive Interest Periods of one month commencing on the date on
amounts become overdue, until paid in full.

### Section 3.   Guarantee to Lenders by Guarantor

3.1   Guarantee. The Guarantor hereby unconditionally and irrevocably guarantees to the Lender
prompt and complete payment when due (whether as stated maturity, by acceleration or otherwi
principal of and interest on the Credit, together with any and all other amounts payable by the Bo
the Lenders under this Agreement or the Note(s). If the Borrower shall fail to pay when due
sums hereby guaranteed (whether at stated maturity, by acceleration or otherwise), the Guara
forthwith pay, without any demand or notice, the full amount due and payable by the Borrow
Dollars at the place and in the manner required by this Agreement or the Note(s). This is a gua
payment and not merely of collection, and shall remain in full force and effect until all the obligati
Borrower hereby guaranteed are paid in full. To the extent permitted by applicable law, the G
waives all defenses of a surety or guarantor to which it may be entitled by statute or otherwise.

### 3.2 Guarantee Continuing and Unconditional.

(a)   the Guarantee is a continuing, absolute and unconditional guarantee of payment a
obligor and not merely as surety, and shall apply to all payment obligations of the Borrow
this Agreement and the Note(s) whenever arising. Without limiting the generality of the

the Guarantee shall not be released, discharged or otherwise affected by: (I) genuineness, legality, validity, regularity or enforceability of this Agreement or the No other agreement or document contemplated hereby; (ii) the surrender, release, substitution, taking of any additional collateral, or impairment of any collateral; (iii) fa Borrower to comply with any of the terms of this Agreement or the Note(s); (iv) any ch name, authorized activities, capital stock, corporate existence, structure, personnel o of the Borrower; (v) any insolvency, bankruptcy, reorganization or other similar affecting the Borrower or its assets; or (vi) any other act or omission to act or delay of the Borrower, the Guarantor, the Lender, or any other Person, or any other ci whatsoever that might, but for the provisions of this Section 3.2 constitute a legal discharge or defense to the Guarantor's obligations hereunder.

(b) The Guarantor hereby irrevocably and expressly waives all diligence, presentments protests and notices of any kind whatsoever, including, without limitation, nonperformance or nonpayment, notices of default, notices of protest, notices of disho of acceptance of this Guarantee and notices of the existence, creating or incurring additional obligations by the Borrower under this Agreement or the Note(s).

(c) The Guarantor consents that, without notice to the Guarantor and without the neces additional endorsement, consent or guarantee by the Guarantor, the liabilities of th hereby guaranteed may, from time to time, be renewed, extended, increased, modified, amended, compromised, waived, released or discharged by the Lender and which is or in the future may be held, or any other guarantee issued for, the pay indebtedness of the Borrower under this Agreement or the Note(s) may be exchang surrendered by the Lender, all without impairing or affecting in any way the oblig Guarantor hereunder. The Lender shall not be obliged to enforce any remedies Borrower or any guarantee or security which it may hold before being entitled to paym Guarantor of the obligations hereby guaranteed.

3.3 **Reinstatement**. The Guarantee shall be automatically reinstated if and to the extent that for any payment by or on behalf of the Borrower in respect of obligations hereby guaranteed i from or repaid by the Lender or any other party as a result of any proceeding in bankruptcy, reorganization or otherwise.

3.4 **Endorsement of Note(s)**. To evidence further the Guarantee contained in this Section 3, th agrees to endorse and execute its guarantee, in the form specified in Exhibit A, immediatel signature of the duly authorized officer(s) of the Borrower on each Note issued by the Borrowe

**Section 4.  Conditions Precedent to Borrowing**

The Lender shall not be obligated to make any Loan to the Borrower hereunder unless the following c form and substance satisfactory to the Lender, have been satisfied:

4.1 **Note(s)**. At the time of the making of the initial Loan, there shall have been delivered to the Le duly executed by the Borrower in the form attached hereto as Exhibit A.

4.2 **Correctness of Representations**. All of the representations and warranties made by the Bor or otherwise in writing in connection herewith shall be true and correct with the same effect as representations and warranties had been made on and as of the date of each Loan.

4.3 **Supporting Documents**. At the time of the making of the initial Loan, there shall have been del Lender the following supporting documents: (a) a copy of the Certificate of Incorporation of t and Guarantor, certified by the authorized officer of the Borrower and Guarantor; (b) a cop Laws of the Guarantor, certified by the Secretary or any Assistant Secretary of the Guarantor t Laws of the Guarantor; (c) a certificate of the Borrower and Guarantor as to the incu signatures of all officers of the Borrower and Guarantor who have executed this Agreement, and any other documents delivered in connection with the transaction contemplated by this

4

and (d) copies of resolutions of the Board of Directors of the Guarantor, certified by the autho
of the Guarantor authorizing the execution, delivery and performance of this Agreement and
and the making of the Loans hereunder.

4.4   **Legal Opinion.** At the time of making of any Loan hereunder, there shall have been deliv
Lender a legal opinion of Indonesian counsel Tumbuan Pane Konsultan Hukum to the B
Guarantor, confirming the enforceability of this Credit Agreement and the Note(s) and othen
and substance satisfactory to the Lender.

The borrowing hereunder shall constitute a representation and warranty by the Borrower and C
the Lender that all of the conditions specified in this Section 4 have been complied with as o
such borrowing and the documents, certificates and resolutions certified to the Lender pursua
4.4 hereof, each remain unmodified and in full force and effect as of the time of such initia
Each subsequent borrowing hereunder shall constitute a representation and warranty by the B
Guarantor to the Lender that all of the conditions specified in this Section 4 have been complie
the time of such borrowing.

## Section 5.       Representation and Warranties

In order to induce the Lender to enter into this Agreement and to make the Loans provided for herein, t
and Guarantor make the following representations and warranties to the Lender, all of which shall
execution and delivery of this Agreement and the Note(s):

5.1   **Power.** The Borrower and Guarantor have the corporate power to enter into this Agreem
Note(s) and to perform its obligations and to borrow hereunder and thereunder.

5.2   **Obligations.** The Borrower's and Guarantor's obligations under this Agreement and the Note(
legal, valid and binding obligations of the Borrower and are enforceable in accordance with the

5.3   **Compliance with Laws and Agreements.** The execution, delivery and the performance of this
and the Note(s) do not violate any law, decree or provision of any nature whatsoever having
law in the Republic of Indonesia or result in the breach of or constitute a default under any a
instrument to which the Borrower and Guarantor are parties or by which it or any of its proper
bound or affected.

5.4   **Governmental Approvals.** To the best of the Borrower's or Guarantor's knowledge after du
authorizations, consent, approvals and declarations of or to competent authorities in the
Indonesia required under any applicable law, regulation or directive in connection with the
delivery, performance, validity and/or enforceability of this Agreement and the Note(s) have be
and are valid and subsisting.

5.5   **Litigation.** No material litigation, arbitration or administrative proceedings are at the prese
pending nor, to the Borrower's or Guarantor's knowledge, threatened against it or its assets
have a material adverse effect on its ability to meet its obligations hereunder.

5.6   **Events of Default.** No Event of Default (as defined herein) has occurred and is continuing.

5.7   **Pari Passu.** The Borrower's and Guarantor's obligations hereunder rank and will rank pari pa
claims of all of its other unsecured and unsubordinated creditors.

5.8   **Financial Condition.** To the best of its knowledge after due inquiry, nothing to the contrary ha
its attention, (i) the audited consolidated balance sheet of the Borrower and Guarantor as at D
1996 and the unaudited statements at December 31, 1997 and the related statements of inco
earnings and changes in financial position and cash flows of the Borrower and Guarantor, co
have heretofore been furnished to the Lender, are complete and correct and present fairly
condition of the Borrower and Guarantor at such date, and (ii) the Borrower and Guarar
contingent obligation, contingent liability or liability for taxes, long-term lease or unusual forv

5

term commitment which is not reflected in the foregoing statements or in the notes thereto to
its knowledge after due inquiry, since December 31, 1997 there has been no material advers[e]
the Borrower's or Guarantor's consolidated assets, liabilities, business or financial condition, an[d]
or circumstance that could reasonably be expected to result in any such material adverse chang[e]

**Section 6.** **Covenants**

The Borrower covenants and agrees that for so long as this Agreement is in effect and until the Loa[n]
Note(s), together with interest and all other obligations incurred hereunder are paid in full:

6.1 <u>Financial Statements and information</u>. It shall furnish or cause to be furnished to the Lender t[he]
financial statements and information, which shall be prepared in accordance with AAS (as [so]
defined) consistently applied:

6.1.1 As soon as available, but in any event within 180 days after the close of each fiscal [year of]
Borrower, an audited consolidated balance sheet of the Borrower as of the close of such
and the related audited consolidated statements of income, retained earnings and
financial position and cash flows of the Borrower for such fiscal year, setting forth in ea[ch]
comparative form the figures for the previous year, certified by the Secretary of the B[orrower]
being consistently prepared in accordance with AAS.

6.1.2 As soon as available but in any event within 90 days after the close of each semi-an[nual]
ending on the last day of June of each fiscal year of the Borrower, unaudited consolida[ted]
sheet of the Borrower as of the last day of such period and unaudited consolidated sta[tements]
income and retained earnings and changes in financial position and cash flows of the B[orrower]
such period and for the period from the beginning of the fiscal year to the end of such p[eriod]
such balance sheet and statement of income and retained earnings and changes
position and cash flows to be certified by the Secretary of the Borrower as being
prepared in accordance with AAS and fairly presenting the consolidated financial co[ndition and]
results of operation of the Borrower, provided that any such certificate may sta[te that the]
accompanying balance sheet and statements are subject to normal year-end adjustme[nts].

6.2 <u>Governmental Approvals</u>. It shall obtain and promptly renew from time to time all au[thorizations]
approvals, consents, licenses and exemptions as may be required under any applicable law, r[egulation or]
directive to enable it to perform its obligations under this Agreement or required for the [validity and]
enforceability of this Agreement.

6.3 <u>Corporate Existence</u>. It shall do or cause to be done all things necessary to preserve and [keep in full]
force and effect its corporate existence, and such rights necessary or useful for the co[nduct of its]
operations.

6.4 <u>Performance of Obligations</u>. It shall duly perform and observe all its obligations under this Agr[eement and]
promptly inform the Lender of any circumstances having or which could have a material adver[se effect on]
its ability to perform its obligations hereunder.

6.5 <u>Notice of Events of Default</u>. It will notify the Lender in writing within ten days of any Event o[f Default or]
any circumstances which, upon the expiration of any agreed cure period, would constitute [an Event of]
Default, forthwith upon becoming aware of the occurrence thereof and of the steps being take[n to remedy]
such Event of Default.

6.6 <u>Conduct of Business</u>. It will carry on and conduct its business in substantially the same ma[nner and in]
substantially the same fields of enterprise as it is presently conducted and to do all things n[ecessary to]
remain duly incorporated, validly existing and in good standing as a domestic corporation in its [jurisdiction]
of incorporation and maintain all requisite authority to conduct its business in each jurisdiction [where its]
business is conducted.

6

6.7    <u>Taxes</u>. It will pay when due all taxes, assessments and governmental charges and levies up[...] income, profits or property, except those which are being contested in good faith by a[...] proceedings and with respect to which adequate reserves have been set aside.

6.8    <u>Merger</u>. It will not merge or consolidate with or into any other Person, unless the Borrower is the[...] entity.

6.9    <u>Sale of Assets</u>. It will not lease, sell or otherwise dispose of all, or substantially all of its property[...] business to any other Person except for sales of inventory in the ordinary course of business.

6.10    <u>Guaranties</u>. It will not make or suffer to exist any guaranty (save for any guaranty of the obliga[...] subsidiary), except by endorsement of instruments for deposit or collection in the ordinary[...] business. It will not create any inter-company loans, provide collateral/securities for the indebt[...] any company other than for its subsidiary. It commits that all existing security to secure existing[...] be released as and when such debt falls due.

6.11    <u>Liens</u>. It will not create, incur, or suffer to exist any lien in, of or on the property of the Borrow[...] subsidiary, except:

(a)    Liens for taxes, assessments or governmental charges or levies on its property if the s[...] not at the time be delinquent or thereafter can be paid without penalty, or are being co[...] good faith and by appropriate proceedings.

(b)    Liens imposed by law, such as carriers', warehousemen's and mechanics' liens and oth[...] liens arising in the ordinary course of business which secure payment of obligations not [...] 60 days past due.

(c)    Liens arising out of pledges or deposits under worker's compensation laws, unen[...] insurance, old age pensions, or other social security or retirement benefits, or similar leg[...]

(d)    Utility easements, building restrictions, and such other encumbrances or charges ag[...] property as are of a nature generally existing with respect to properties of a similar cha[...] which do not in any material way affect the marketability of the same or interfere wit[...] thereof in the business of the Borrower or the Subsidiaries.

(e)    Liens on specific future assets linked to long-term Export Credit Agency ("ECA") or other[...] which are required to be pledged and/or charged to such lenders.

**Section 7.**    <u>Events of Default</u>

Upon the occurrence of any of the following specified events (each herein called an "<u>Event of Default</u>"):

7.1    <u>Payments</u>. The Borrower or Guarantor shall default in the due and punctual payment of any prin[...] interest on the Loans, the Note(s), the fees or any other amount due hereunder and shall not re[...] default within a period of ten days; or

7.2    <u>Representations and Warranties</u>. Any representation, warranty or statement made herein or ot[...] writing in connection herewith, or in any certificate or statement furnished pursuant hereto or in c[...] herewith, shall be breached or shall prove to be incorrect, misleading or incomplete in any materi[...] on the date as of when made; or

7.3    <u>Covenants</u>. The Borrower or Guarantor shall default in the due performance or observance of [...] covenant or agreement on its part to be performed or observed pursuant to any of the provisio[...] Agreement (other than those referred to in Sections 7.1 and 7.2) and such default shall[...] unremedied for a period of 30 days; or

7.4 <u>Insolvency</u>. The Borrower or Guarantor shall suspend or discontinue its business operations fo____ of insolvency; shall make an assignment for the benefit of creditors or a composition with credi____ generally fail to pay its debts as such debts become due; shall file a petition commencing a volu____ concerning the Borrower or Guarantor under any applicable law, or an involuntary case ____ commenced against the Borrower or Guarantor under any such chapter and relief is ordered a____ Borrower or Guarantor or the petition is controverted but is not dismissed within 90 days____ commencement of the case; or shall petition or apply to any tribunal for the appointment of any____ custodian, liquidator or trustee of or for it or any substantial part of its property, or shall comm____ proceeding relating to the Borrower or Guarantor under any bankruptcy, reorganization, arra____ readjustment of debt, receivership, dissolution or liquidation law or statute of any jurisdiction, wh____ or hereafter in effect, or if there is commenced against the Borrower or Guarantor any such p____ which remains undismissed for a period of 90 days, or an order, judgment or decree approving th____ in any such proceeding shall be entered; or the Borrower or Guarantor by any act or failure to act____ its consent, to approval of or acquiescence in any such proceeding or the appointment of any____ custodian, liquidator or trustee of or for it for any substantial part of its property, or suffers ____ appointment to continue undischarged or unstayed for a period of 60 days; or the Borrower or ____ shall take any corporate action for the purpose of effecting any of the foregoing; or

7.5 <u>Judgments</u>. A final, non-appealable judgment or judgments for the payment of money in exce____ $30,000,000 in the aggregate shall be rendered against the Borrower or Guarantor and any such____ or judgments shall, if unsatisfied, remain unstayed for a period in excess of 30 days; or ____

7.6 <u>Cross Default</u>. (a) any debt of the Borrower or Guarantor is not paid when due (after taking int____ any applicable grace period) and such debt aggregates more than U.S.$10,000,000 in the ca____ Borrower (or the equivalent in other currencies); or $25,000,000 in the case of the Guarant____ equivalent in other currencies); or (b) any debt of the Borrower or Guarantor becomes prema____ and payable or is placed on demand or any security interest any debt over any asset of the B____ the Guarantor becomes enforceable as a result of an event of default (howsoever described) ____ document relating to that debt and such debt aggregates more than U.S.$10,000,000 in th____ the Borrower (or the equivalent in other currencies), or $25,000,000 in the case of the Guaran____ equivalent in other currencies).

7.7 <u>Nationalization/Expropriation</u>. all or a material part of the assets of the Borrower are seized, na____ expropriated or compulsorily purchased by or under the authority of any government or agen____ government and, in the opinion of the Lender, such seizure, nationalization, expropriation or c____ purchase would have a material adverse effect on the financial condition of the Borrower or on it____ perform any of its obligations under this Agreement.

7.8 <u>Material Adverse Change</u>. Any event or series of events occurs which, in the reasonable opi____ Lenders, might have a material and adverse effect on the financial condition or operations of the____ or the Guarantor or on the ability of the Borrower or Guarantor to comply with its obligations ____ Agreement.

Then, and in any such event, (a) if such event is an Event of Default specified in Se____ automatically, the Commitment shall terminate and the Loans (with accrued interest thereon) an____ amounts owing under this Agreement and the Note(s), shall immediately become due and pay____ (b) if such event is any other Event of Default and, at any time thereafter, if any such Event of D____ then be continuing, the Lender may, by written notice to the Borrower: (I) declare the princi____ accrued interest on the Note to be, whereupon the same together with all other amounts paya____ Borrower to the Lender hereunder shall forthwith become, due and payable without presentment____ protest or other notice of any kin, all of which are hereby waived by the Borrower and (ii) d____ Commitment terminated, whereupon the Commitment of the Lender shall forthwith terminate im____ Notwithstanding the exercise of either or both of the remedies set forth above, the Lender may____ disbursements after the happening of any Event of Default without thereby waiving its right t____ payment of the Note or to exercise any remedy hereunder or under the Note, and without liabili____ any other or further disbursements.

8

## Section 8.    Miscellaneous

8.1    <u>Payment of Expenses</u>. The Borrower agrees to pay and save the Lender harmless against liabi... payment of reasonable out-of-pocket expenses arising in connection with the preparation, delivery, administration and enforcement of this Agreement, the Note(s) and any docu... transactions contemplated hereby, as well as any amendment, supplement or modification to, or any provision thereof including without limitation all sales, documentary, stamp and similar... assessments, and recording and filing fees charged by any governmental authority, and the... disbursements of counsel to the Lender. The Borrower will also reimburse the Lender for the... cost incurred with respect to this Agreement.

8.2    <u>Amendment and Waiver</u>. Neither this Agreement nor any provision hereof may be amended, waived, discharged or terminated orally, but only by an instrument in writing signed by the par... whom enforcement of the amendment, change, waiver, discharge or termination is sought.

8.3    <u>Governing Law</u>. This Agreement and the rights and obligations of the parties hereunder and... Note shall be construed in accordance with and be governed by the laws of the State of Illinoi... giving effect to any choice of law principles.

8.4    <u>Notices</u>. Except as otherwise provided herein, all notices, requests, demands and other commi... which are required or permitted hereunder shall be in writing and shall be deemed to have been... (a) when delivered personally, (b) on the following Business Day when sent by overnight courier, date and time of receipt by the sender of the correct answer-back or notification of s... transmission, as appropriate when sent by facsimile; and (d) on the third following Business... mailed by registered or certified mail, postage prepaid, return receipt requested as follows:...

If to the Borrower, to:                        If to the Lender, to:

| | |
|---|---|
| PT Indah Kiat Pulp & Paper Corporation Tbk | Beloit Corporation |
| Wisma BII Jalan MH Thamrin  Kav 22 | 1 St. Lawrence Avenue |
| Jakarta, Pusat 01350 | Beloit, Wisconsin 53511 |
| Indonesia | U.S.A. |
| Attention: Mr. Ronny Kumiawan | Attention:  Victor F. Pocius |
| | Fax:  (608) 364-1747 |

or to such other address as may be specified in a notice given by one party to the other.

8.5    <u>Waiver, Etc</u>. No failure or delay on the part of the Lender in exercising any right, power or privil... this Agreement or the Note(s) and no course of dealing between the Borrower and the Le... operate as a waiver thereof; no shall any single or partial exercise of any right, power o... hereunder preclude any other or further exercise thereof or the exercise of any other right, privilege. The rights and remedies herein expressly provided are cumulative and not exclus... rights or remedies which the Lender would otherwise have pursuant to law or equity.  No no... demand on the Borrower in any case shall entitle the Borrower to any other or further notice or... similar or other circumstances or constitute a waiver of the right of the Lender to any other or fur... in any circumstances without notice or demand.

8.6.    <u>Descriptive Heading, Etc</u>. The descriptive headings of the several sections of this Agreement a... for convenience only and shall not be deemed to affect the meaning or construction of a... provisions hereof.

8.7    <u>Benefit of Agreement</u>. This Agreement shall be binding upon the Borrower and shall inure to the... the Lender and its successors and assigns. The Lender may sub-participate, assign or transfe... respective rights, benefits or obligations hereunder without the consent of the Borrower, and the... hereby agrees and consents to such assignment.

9

8.8     Domicile of Loans.  The Lender may transfer and carry the Loans at, to or for the account of
        office or subsidiary of the Lender.  Any transfer instigated by the Lender shall not be at any c
        withholding or other tax expense to the Borrower.

8.9     Consent to Jurisdiction.  The Borrower or Guarantor hereby irrevocably agrees that any s
        proceeding or claim against it arising out of, or relating in anyway  to, this Agreement, the
        Note(s) or any transaction contemplated hereby or any judgment entered by any court in resp
        may be brought and enforced in any Illinois State or Federal Court sitting in the City of Chicago
        Borrower hereby irrevocably submits to the non-exclusive jurisdiction of such courts for the purp
        such suit, action, proceeding or claims.  The Borrower hereby irrevocably waives, to the fu
        permitted by law, any objection which it may now or hereafter have to the laying of venue
        action or proceeding arising out of or relating to this Agreement, the Loans, the Note(s) or any
        contemplated hereby brought in any Illinois State or Federal Court sitting in the City of Ch
        hereby further irrevocably waives any claims that any such suit, action or proceeding brought i
        court has been brought in an inconvenient forum. The Borrower further irrevocably consents the
        process out of any of the aforementioned courts in any such suit, action, proceeding or cl
        mailing of copies thereof by certified air mail, postage prepaid to the Borrower at its address
        above.  THE LENDER AND THE BORROWER EACH HEREBY EXPRESSLY WAIVE ANY
        MAY HAVE NOW OR HEREAFTER TO A JURY TRIAL IN ANY SUIT, ACTION OR PRO
        ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE LOANS, THE NOTE, OR AN
        TRANSACTION CONTEMPLATED HEREBY.

8.10    AAS.  Calculations hereunder shall be made and financial statements and data required here
        prepared, both as to classification of items and as to amount, in accordance with generally
        accounting standards in the Republic of Indonesia ("AAS") consistently applied, except as
        expressly provided herein.

8.11    Entire Agreement.  This Agreement and the Note embody the entire Agreement and understand
        the parties hereto with respect to the subject matter hereof and supersede all prior agree
        understandings between the parties hereto.

8.12    Execution in Counterpart.  This Agreement may be executed in one or more counterparts, ea
        when so executed and delivered shall be deemed to be an original and all of which taken tog
        constitute one and the same instrument.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly
representatives as of the date first above written.

PT INDAH KIAT PULP & PAPER CORPORATION Tbk

By: _____

BELOIT CORPORATION

By: _____

ASIA PULP & PAPER COMPANY LIMITED

By: _____

10

# EXHIBIT B

NOTE : A003

# PT. INDAH KIAT PULP & PAPER CORPORATION Tbk
## JAKARTA, INDONESIA

### PROMISSORY NOTE

US$21,809,962.00

April 25, 1998

FOR VALUE RECEIVED, PT Indah Kiat Pulp & Paper Corporation (the "Borrower") by this promissory note ("Note") promises to pay to the order of Beloit Corporation (the "Lender"), the principal sum of US$21,809,962.00 (Twenty One Million Eight Hundred Nine Thousand Nine Hundred Sixty Two and ⁰⁰/₁₀₀), in lawful currency of the United States, in installments as provided below, and to pay interest in like currency on the principal balance hereof from time time outstanding, at an interest rate per annum equal to six (6) month, London Interbank Offered Rate ("LIBOR") starting from February 28, 1998, for comparable amounts as determined by the Lender (as defined above), plus two and one-eight percent (2.125%).

The principal of this Note is payable in eight (8) installments, the first one (1) of which shall be in the amount of US$1,179,962.00 (One Million One Hundred Seventy Nine Thousand Nine Hundred Sixty Two and ⁰⁰/₁₀₀), the second (2) of which shall be in the amount of US$1,100,000.00 (One Million One Hundred Thousand and ⁰⁰/₁₀₀) with the final six (6) installments in the amount of US$3,255,000.00 (Three Million Two Hundred Fifty Five Thousand and ⁰⁰/₁₀₀) each. First (1) installment will be due September 30, 1999, and semi-annually thereafter until paid in full.

Interest on this Note will accrue from February 28, 1998. First interest payment is due on September 30, 1998, and semi-annually thereafter. Interest shall be computed on the basis of the actual number of days elapsed, using a 360 day year.

Failure to pay any installment of principal and interest when due, with a grace period of 30 days in accordance with the terms of the credit agreement, shall mature the whole amount of the principal unpaid and accrued interest, and the same shall be due and payable, and said sum shall continue to accrue interest at the rate of LIBOR plus three and one-eight percent (LIBOR + 3.125%) until paid.

The Borrower hereby waives presentment, demand, notice or protest of any kind. This Note shall be governed by and construed in accordance with the Laws of the State of Illinois. This note may be prepaid at any time by the borrower

This Note may be transferred and shall be assignable to third parties, including, without limitation, The First National Bank of Chicago, and the Borrower hereby consents to any such transfer.

PT. INDAH KIAT PULP & PAPER CORPORATION Tbk

WITNESS : _____     BY    : _____
                        TITLE : _____

**GUARANTEE**

FOR VALUE RECEIVED, the undersigned Asia Pulp & Paper Company Ltd, as primary obligor(s), hereby (jointly and severally) unconditionally guarantee(s) the prompt payment of principal and interest on the foregoing promissory note when and as due in accordance with its terms.

ASIA PULP & PAPER COMPANY LTD.

WITNESS:_____         BY    : _____
                          TITLE : _____

# EXHIBIT

# C

# CREDIT AGREEMENT

THIS CREDIT AGREEMENT (the "Agreement"), dated as of _April 25_, 1998 by and betwee[...]
Kertas Tjiwi Kimia Tbk, a corporation duly organized under the laws of the Republic of Indonesia (the "Bor[...]
Asia Pulp & Paper Company Ltd., a corporation duly organized under the laws of the Republic of Singap[...]
"Guarantor"), and Beloit Corporation, a corporation duly organized under the laws of the State of Dela[...]
"Lender").

The parties hereto hereby agree as follows:

**Section 1.**   **Certain Definitions**

1.1   "Borrower" shall mean between PT Pabrik Kertas Tjiwi Kimia Tbk, a corporation organized under [...]
of the Republic of Indonesia.

1.2   "Business Day" shall mean a day for dealings by and between banks in the London interbank mar[...]
a day which shall be in Chicago, Singapore and Jakarta a day for dealings by and between con[...]
banks in Chicago, Singapore and Jakarta other than a day they are authorized or required b[...]
close.

1.3   "Fees" shall mean all bank, insurance, and legal fees incurred in structuring and documenting the [...]

1.4   "Guarantor" shall mean Asia Pulp & Paper Company, Ltd., a corporation organized under the law[...]
Republic of Singapore.

1.5   "Guarantee" shall mean the guarantee provided by the Guarantor to the Lender hereunder in ac[...]
with Section 3.1.

1.6   "[Interest Period]" shall mean each period for which a particular interest rate will apply to a Loan wh[...]
be in all cases six months, provided, however, that the initial Interest Period shall be of seven (7) [...]
duration.

1.7   "Lender" shall mean Beloit Corporation and any of its successors and assigns.

1.8   "Interest Rate" shall mean for each Interest Period, the sum of 2.125% per annum and the LIBO[...]
defined hereunder.

1.9   "LIBOR Rate" shall, with respect to each Interest Period, mean the arithmetic average of the offer[...]
displayed on Telerate Page 3750 for US Dollar deposits in the London interbank eurodollar m[...]
comparable amounts with maturities comparable to the Interest Period for which such rate will [...]
11:00a.m. (local London time) two Business Days prior to the commencement of such Interest Pe[...]
no such offered rates appear on such page, the LIBOR Rate for such Interest Period will be the a[...]
average of rates quoted by not less than two major banks in the London interbank market selecte[...]
Lender, at approximately 11:00a.m. (Local London time) two Business Days prior to the first day [...]
Interest Period for such deposits of such maturity. If, by reason of circumstances affecting the [...]
interbank eurodollar market generally, the Lender determines (which determination shall be f[...]
conclusive, absent manifest error), that the Lender cannot reasonably ascertain the LIBOR Rate [...]
either of the means set forth herein, then the LIBOR Rate for such interest period will be a[...]
average of the rates quoted by not less than two major banks in the New York interbank market [...]
by the Lender, at approximately 11:00a.m. (local New York time) two Business Days prior to the [...]
of such Interest Period for such deposits of such maturity. The LIBOR Rate shall be calculate[...]
decimal places, rounded to the next highest one hundred-thousandth (1/100,000) of one percent.[...]

1.10   "Person" shall mean and include any individual, firm, corporation, partnership, trust [...]
unincorporated organization or association or other enterprise or any government or political sub[...]
agency, department or instrumentality thereof.

1.11   "Subsidiary" shall mean each corporation or other entity of which the Borrower, directly or ind

(a) owns more than fifty percent of (i) the stock of such corporation or entity of any class
under ordinary circumstances to vote for the selection of directors, or (ii) the capital or eq
of such corporation or entity; or (b) has the power, whether by contract or otherwi
named of such corporation or entity; or (b) has the power, whether by contract or otherwi
majority of the Board of Directors or its equivalent of such corporation or entity or to direct
direction of the management and policies of such corporation or entity.

## Section 2.   Amount and Terms of Credit

2.1   The Loans.  Subject to and upon the terms and conditions herein set forth, the Lender ag
loans in United States dollars (each a "Loan" and collectively, the "Loans") to the Borrower
shall be extended when all conditions precedent are presented on the date of signing of th
(the "Effective Date") and may be prepaid in accordance with the terms hereof and shall be
the Interest Rate, and shall not exceed in aggregate principal amount at any one time
U.S.$16,213,352.95.00 (United States Dollars Sixteen Million Two Hundred Thirteen Tho
Hundred Fifty Two and $^{95}/_{100}$) (the "Commitment").  The Agreement expires five years fro
signing (the "Expiry Date") of the Note(s), defined hereunder in Section 2.3, provided, how
terms and conditions hereof shall remain in full force and effect until all Loans have been fully

2.2   Purpose of Loan.  The Loan will partially finance the Borrower's purchase of one fine pa
MPM11 from the Lender.  The total purchase cost of this machine is approximately U.S. $136

2.3   Repayment of Principal; the Note(s).  The Borrower's obligation to repay the principal an
interest on the Loans shall be evidenced by promissory note(s) (the "Note(s)") of t
substantially in the form attached hereto as Exhibit A. The Note(s) shall (i) be entitled to the b
Agreement; (ii) be dated the date hereof, be in the maximum principal amount of the Commi
payable to the order of the Lender; (iii) bear interest in the manner provided in Section 2.1; an
on the Expiry Date.

2.4   Interest on Loans

(a)   Interest Rates.  The Loans shall bear interest from the Effective Date thereof
(whether by acceleration or otherwise) at a rate per annum equal to the Interest Rate

(b)   Interest Periods.  Subject to the provisions of Section 2.4, the Interest Period comme
disbursement date shall be for six  month periods.  Each Interest Period occurring a
Interest Period shall commence on the day on which the next preceding Interest P
Each Interest Period shall be subject to the provisions of Section 2.7(b).  No Interes
extend beyond the Expiry Date.

(c)   Interest Payment Dates.  Interest in respect of the Loans shall be payable on the exp
each Interest Period applicable to such Loans and at maturity (whether by ac
otherwise).

2.5   Gross-up.  All payments made by the Borrower to the Lender under this Agreement shall
and clear of and without deduction for or on account of any tax unless the Borrower is requ
make a payment subject to such deduction or withholding of tax, in which case the sum pa
Borrower in respect of which such deduction or withholding is required to be made shall be
the extent necessary to ensure that, after the making of such deduction or withholding
receives and retains (free from any liability in respect of such deduction or withholding) a net
the sum which it would have received and retained had no such deduction or withholding b
required to be made.

2.6   Calculations.  Interest and all fees shall be calculated on the basis of a 360 day year on the a
of days elapsed.

2

2.7    Payments.

    (a)    Manner and Place of Payment. All payments under this Agreement shall be made r 11:00a.m. (local time for receiving bank) on the date when due and shall be ma transferable U.S. dollars and in immediately available funds at the Lender's desi account in the United States or for the account of such office of the Lender or any ass Lender may from time to time direct. Any change of office for the account of such p not be at any cost, duties, withholding or other tax expense to the Borrower. All pay this Agreement shall be made under all circumstances and without regard to the residence or domicile of the Lender and without requiring any affidavit or the fulfil other formality. All payments under this Agreement and the Note(s) shall be made w or counterclaim and in such amounts as may be necessary in order that all such pa amounts otherwise specified to be paid under this Agreement and the Note(s).

    (b)    Payments Due on Saturdays, Sundays and Holidays. Whenever any payment hereunder or under the Note(s) shall be stated to be due on a day which is not a Bu the due date thereof shall be extended to the next succeeding Business Day and inte payable at the applicable rate during such extension unless the result of such extens to cause such due date to fall in the next calendar month or after the Expiry Date, i the due date thereof shall be the next preceding Business Day, with consequent a interest charges for the number of days by which the due date is moved forward.

    (c)    Prepayments. The Borrower shall have the right to prepay any Loan in whole or in time and from time to time on the following terms and conditions: (i) the Borrower s than 9:00a.m. (local Singapore time) three Business Days preceding the date of prepa the Lender in writing or by facsimile of its intent to prepay such Loan: (ii) at prepayment the Borrower shall pay all costs and expenses (iii) at the time of prep Borrower shall pay all interest accrued on the amount prepaid; and (iv) all prepaymen the minimum principal amount of $1,000,000. Amounts prepaid may not be re prepayment occurs anytime other than at the end of any Interest Period, then the Bor to compensate the Lender for any reasonable costs incurred by the Lender that are di from the re-deployment of funds.

    (d)    Overdue Amounts. Overdue principal and, to the extent permitted by law, overdu respect of each Loan, shall bear interest, payable on demand, at a rate per annum w equal to 3.125% per annum in excess of the Interest Rate calculated on a day's e pro rata for successive Interest Periods of one month commencing on the date c amounts become overdue, until paid in full.

**Section 3.**    **Guarantee to Lenders by Guarantor**

3.1    Guarantee. The Guarantor hereby unconditionally and irrevocably guarantees to the Len prompt and complete payment when due (whether as stated maturity, by acceleration or othe principal of and interest on the Credit, together with any and all other amounts payable by the the Lenders under this Agreement or the Note(s). If the Borrower shall fail to pay when d sums hereby guaranteed (whether at stated maturity, by acceleration or otherwise), the Gu forthwith pay, without any demand or notice, the full amount due and payable by the Borr Dollars at the place and in the manner required by this Agreement or the Note(s). This is a payment and not merely of collection, and shall remain in full force and effect until all the oblig Borrower hereby guaranteed are paid in full. To the extent permitted by applicable law, th waives all defenses of a surety or guarantor to which it may be entitled by statute or otherwise

3.2 Guarantee Continuing and Unconditional.

    (a)    the Guarantee is a continuing, absolute and unconditional guarantee of paymen obligor and not merely as surety, and shall apply to all payment obligations of the Bo this Agreement and the Note(s) whenever arising. Without limiting the generality of t

3

the Guarantee shall not be released, discharged or otherwise affected by: (I) genuineness, legality, validity, regularity or enforceability of this Agreement or the No other agreement or document contemplated hereby; (ii) the surrender, release, substitution, taking of any additional collateral, or impairment of any collateral; (iii) fa Borrower to comply with any of the terms of this Agreement or the Note(s); (iv) any ch name, authorized activities, capital stock, corporate existence, structure, personnel o of the Borrower; (v) any insolvency, bankruptcy, reorganization or other similar affecting the Borrower or its assets; or (vi) any other act or omission to act or delay of the Borrower, the Guarantor, the Lender, or any other Person, or any other c whatsoever that might, but for the provisions of this Section 3.2 constitute a legal discharge or defense to the Guarantor's obligations hereunder.

(b)     The Guarantor hereby irrevocably and expressly waives all diligence, presentments protests and notices of any kind whatsoever, including, without limitation, nonperformance or nonpayment, notices of default, notices of protest, notices of disho of acceptance of this Guarantee and notices of the existence, creating or incurring additional obligations by the Borrower under this Agreement or the Note(s).

(c)     The Guarantor consents that, without notice to the Guarantor and without the nece additional endorsement, consent or guarantee by the Guarantor, the liabilities of t hereby guaranteed may, from time to time, be renewed, extended, increased, modified, amended, compromised, waived, released or discharged by the Lender and which is or in the future may be held, or any other guarantee issued for, the pay indebtedness of the Borrower under this Agreement or the Note(s) may be exchang surrendered by the Lender, all without impairing or affecting in any way the oblig Guarantor hereunder. The Lender shall not be obliged to enforce any remedies Borrower or any guarantee or security which it may hold before being entitled to paym Guarantor of the obligations hereby guaranteed.

3.3     Reinstatement. The Guarantee shall be automatically reinstated if and to the extent that for any payment by or on behalf of the Borrower in respect of obligations hereby guaranteed i from or repaid by the Lender or any other party as a result of any proceeding in bankruptcy, reorganization or otherwise.

3.4     Endorsement of Note(s). To evidence further the Guarantee contained in this Section 3, th agrees to endorse and execute its guarantee, in the form specified in Exhibit A, immediatel signature of the duly authorized officer(s) of the Borrower on each Note issued by the Borrowe

**Section 4.     Conditions Precedent to Borrowing**

The Lender shall not be obligated to make any Loan to the Borrower hereunder unless the following c form and substance satisfactory to the Lender, have been satisfied:

4.1     Note(s). At the time of the making of the initial Loan, there shall have been delivered to the Le duly executed by the Borrower in the form attached hereto as Exhibit A.

4.2     Correctness of Representations. All of the representations and warranties made by the Bor or otherwise in writing in connection herewith shall be true and correct with the same effect as representations and warranties had been made on and as of the date of each Loan.

4.3     Supporting Documents. At the time of the making of the initial Loan, there shall have been del Lender the following supporting documents: (a) a copy of the Certificate of Incorporation of t and Guarantor, certified by the authorized officer of the Borrower and Guarantor; (b) a cop Laws of the Guarantor, certified by the Secretary or any Assistant Secretary of the Guarantor Laws of the Guarantor; (c) a certificate of the Borrower and Guarantor as to the incu signatures of all officers of the Borrower and Guarantor who have executed this Agreement, and any other documents delivered in connection with the transaction contemplated by this

4

and (d) copies of resolutions of the Board of Directors of the Guarantor, certified by the auth of the Guarantor authorizing the execution, delivery and performance of this Agreement an and the making of the Loans hereunder.

4.4 **Legal Opinion.** At the time of making of any Loan hereunder, there shall have been de Lender a legal opinion of Indonesian counsel Tumbuan Pane Konsultan Hukum to the Guarantor, confirming the enforceability of this Credit Agreement and the Note(s) and othe and substance satisfactory to the Lender.

The borrowing hereunder shall constitute a representation and warranty by the Borrower and the Lender that all of the conditions specified in this Section 4 have been complied with as such borrowing and the documents, certificates and resolutions certified to the Lender pursua 4.4 hereof, each remain unmodified and in full force and effect as of the time of such init Each subsequent borrowing hereunder shall constitute a representation and warranty by the Guarantor to the Lender that all of the conditions specified in this Section 4 have been compl the time of such borrowing.

## Section 5.    Representation and Warranties

In order to induce the Lender to enter into this Agreement and to make the Loans provided for herein, and Guarantor make the following representations and warranties to the Lender, all of which sha execution and delivery of this Agreement and the Note(s):

5.1 **Power.** The Borrower and Guarantor have the corporate power to enter into this Agree Note(s) and to perform its obligations and to borrow hereunder and thereunder.

5.2 **Obligations.** The Borrower's and Guarantor's obligations under this Agreement and the Note legal, valid and binding obligations of the Borrower and are enforceable in accordance with th

5.3 **Compliance with Laws and Agreements.** The execution, delivery and the performance of th and the Note(s) do not violate any law, decree or provision of any nature whatsoever havin law in the Republic of Indonesia or result in the breach of or constitute a default under any instrument to which the Borrower and Guarantor are parties or by which it or any of its prop bound or affected.

5.4 **Governmental Approvals.** To the best of the Borrower's or Guarantor's knowledge after d authorizations, consent, approvals and declarations of or to competent authorities in the Indonesia required under any applicable law, regulation or directive in connection with t delivery, performance, validity and/or enforceability of this Agreement and the Note(s) have b are valid and subsisting.

5.5 **Litigation.** No material litigation, arbitration or administrative proceedings are at the pres pending nor, to the Borrower's or Guarantor's knowledge, threatened against it or its assets have a material adverse effect on its ability to meet its obligations hereunder.

5.6 **Events of Default.** No Event of Default (as defined herein) has occurred and is continuing.

5.7 **Pari Passu.** The Borrower's and Guarantor's obligations hereunder rank and will rank pari p claims of all of its other unsecured and unsubordinated creditors.

5.8 **Financial Condition.** To the best of its knowledge after due inquiry, nothing to the contrary ha its attention, (i) the audited consolidated balance sheet of the Borrower and Guarantor as at 1996 and the unaudited statements at December 31, 1997 and the related statements of inc earnings and changes in financial position and cash flows of the Borrower and Guarantor, co have heretofore been furnished to the Lender, are complete and correct and present fairl condition of the Borrower and Guarantor at such date, and (ii) the Borrower and Guara contingent obligation, contingent liability or liability for taxes, long-term lease or unusual for

5

term commitment which is not reflected in the foregoing statements or in the notes thereto
its knowledge after due inquiry, since December 31, 1997 there has been no material adver
the Borrower's or Guarantor's consolidated assets, liabilities, business or financial condition,
or circumstance that could reasonably be expected to result in any such material adverse cha

**Section 6.**     **Covenants**

The Borrower covenants and agrees that for so long as this Agreement is in effect and until the Lo
Note(s), together with interest and all other obligations incurred hereunder are paid in full:

6.1     Financial Statements and information. It shall furnish or cause to be furnished to the Lender
        financial statements and information, which shall be prepared in accordance with AAS (a
        defined) consistently applied:

        6.1.1   As soon as available, but in any event within 180 days after the close of each fisca
                Borrower, an audited consolidated balance sheet of the Borrower as of the close of su
                and the related audited consolidated statements of income, retained earnings and
                financial position and cash flows of the Borrower for such fiscal year, setting forth in
                comparative form the figures for the previous year, certified by the Secretary of the
                being consistently prepared in accordance with AAS.

        6.1.2   As soon as available but in any event within 90 days after the close of each semi-a
                ending on the last day of June of each fiscal year of the Borrower, unaudited consolid
                sheet of the Borrower as of the last day of such period and unaudited consolidated s
                income and retained earnings and changes in financial position and cash flows of the
                such period and for the period from the beginning of the fiscal year to the end of such
                such balance sheet and statement of income and retained earnings and changes
                position and cash flows to be certified by the Secretary of the Borrower as being
                prepared in accordance with AAS and fairly presenting the consolidated financial c
                results of operation of the Borrower, provided that any such certificate may st
                accompanying balance sheet and statements are subject to normal year-end adjustm

6.2     Governmental Approvals. It shall obtain and promptly renew from time to time all au
        approvals, consents, licenses and exemptions as may be required under any applicable law,
        directive to enable it to perform its obligations under this Agreement or required for the
        enforceability of this Agreement.

6.3     Corporate Existence. It shall do or cause to be done all things necessary to preserve and
        force and effect its corporate existence, and such rights necessary or useful for the c
        operations.

6.4     Performance of Obligations. It shall duly perform and observe all its obligations under this Ag
        promptly inform the Lender of any circumstances having or which could have a material adve
        its ability to perform its obligations hereunder.

6.5     Notice of Events of Default. It will notify the Lender in writing within ten days of any Event
        any circumstances which, upon the expiration of any agreed cure period, would constitute
        Default, forthwith upon becoming aware of the occurrence thereof and of the steps being tak
        such Event of Default.

6.6     Conduct of Business. It will carry on and conduct its business in substantially the same m
        substantially the same fields of enterprise as it is presently conducted and to do all things
        remain duly incorporated, validly existing and in good standing as a domestic corporation in i
        of incorporation and maintain all requisite authority to conduct its business in each jurisdictio
        business is conducted.

6.7    Taxes. It will pay when due all taxes, assessments and governmental charges and levies u income, profits or property, except those which are being contested in good faith by proceedings and with respect to which adequate reserves have been set aside.

6.8    Merger. It will not merge or consolidate with or into any other Person, unless the Borrower is t entity.

6.9    Sale of Assets. It will not lease, sell or otherwise dispose of all, or substantially all of its propert business to any other Person except for sales of inventory in the ordinary course of business.

6.10   Guaranties. It will not make or suffer to exist any guaranty (save for any guaranty of the oblig subsidiary), except by endorsement of instruments for deposit or collection in the ordinary business. It will not create any inter-company loans, provide collateral/securities for the inde any company other than for its subsidiary. It commits that all existing security to secure existin be released as and when such debt falls due.

6.11   Liens. It will not create, incur, or suffer to exist any lien in, of or on the property of the Borr subsidiary, except:

(a)    Liens for taxes, assessments or governmental charges or levies on its property if the not at the time be delinquent or thereafter can be paid without penalty, or are being good faith and by appropriate proceedings.

(b)    Liens imposed by law, such as carriers', warehousemen's and mechanics' liens and o liens arising in the ordinary course of business which secure payment of obligations no 60 days past due.

(c)    Liens arising out of pledges or deposits under worker's compensation laws, un insurance, old age pensions, or other social security or retirement benefits, or similar le

(d)    Utility easements, building restrictions and such other encumbrances or charges property as are of a nature generally existing with respect to properties of a similar ch which do not in any material way affect the marketability of the same or interfere thereof in the business of the Borrower or the Subsidiaries.

(e)    Liens on specific future assets linked to long-term Export Credit Agency ("ECA") or oth which are required to be pledged and/or charged to such lenders.

**Section 7.    Events of Default**

Upon the occurrence of any of the following specified events (each herein called an "Event of Default"):

7.1    Payments. The Borrower or Guarantor shall default in the due and punctual payment of any p interest on the Loans, the Note(s), the fees or any other amount due hereunder and shall not default within a period of ten days; or

7.2    Representations and Warranties. Any representation, warranty or statement made herein or writing in connection herewith, or in any certificate or statement furnished pursuant hereto or in herewith, shall be breached or shall prove to be incorrect, misleading or incomplete in any mat on the date as of when made; or

7.3    Covenants. The Borrower or Guarantor shall default in the due performance or observance covenant or agreement on its part to be performed or observed pursuant to any of the provi Agreement (other than those referred to in Sections 7.1 and 7.2) and such default sh unremedied for a period of 30 days; or

7

7.4    Insolvency. The Borrower or Guarantor shall suspend or discontinue its business operations f
of insolvency; shall make an assignment for the benefit of creditors or a composition with credi
generally fail to pay its debts as such debts become due; shall file a petition commencing a volu
concerning the Borrower or Guarantor under any applicable law, or an involuntary case
commenced against the Borrower or Guarantor under any such chapter and relief is ordered a
Borrower or the petition is controverted but is not dismissed within 90 days
commencement of the case; or shall petition or apply to any tribunal for the appointment of any
custodian, liquidator or trustee of or for it or any substantial part of its property, or shall comm
proceeding relating to the Borrower or Guarantor under any bankruptcy, reorganization, arra
readjustment of debt, receivership, dissolution or liquidation law or statute of any jurisdiction, wh
or hereafter in effect, or if there is commenced against the Borrower or Guarantor any such p
which remains undismissed for a period of 90 days, or an order, judgment or decree approving t
in any such proceeding shall be entered; or the Borrower or Guarantor by any act or failure to ac
its consent, to approval of or acquiescence in any such proceeding or the appointment of any
custodian, liquidator or trustee of or for it for any substantial part of its property, or suffers
appointment to continue undischarged or unstayed for a period of 60 days; or the Borrower or
shall take any corporate action for the purpose of effecting any of the foregoing; or

7.5    Judgments. A final, non-appealable judgment or judgments for the payment of money in exce
$30,000,000 in the aggregate shall be rendered against the Borrower or Guarantor and any such
or judgments shall, if unsatisfied, remain unstayed for a period in excess of 30 days; or

7.6    Cross Default. (a) any debt of the Borrower or Guarantor is not paid when due (after taking in
any applicable grace period) and such debt aggregates more than U.S.$10,000,000 in the ca
Borrower (or the equivalent in other currencies), or $25,000,000 in the case of the Guarant
equivalent in other currencies); or (b) any debt of the Borrower or Guarantor becomes prema
and payable or is placed on demand or any security interest any debt over any asset of the B
the Guarantor becomes enforceable as a result of an event of default (howsoever described)
document relating to that debt and such debt aggregates more than U.S.$10,000,000 in th
the Borrower (or the equivalent in other currencies), or $25,000,000 in the case of the Guaran
equivalent in other currencies).

7.7    Nationalization/Expropriation. all or a material part of the assets of the Borrower are seized, na
expropriated or compulsorily purchased by or under the authority of any government or agen
government and, in the opinion of the Lender, such seizure, nationalization, expropriation or c
purchase would have a material adverse effect on the financial condition of the Borrower or on i
perform any of its obligations under this Agreement.

7.8    Material Adverse Change. Any event or series of events occurs which, in the reasonable opi
Lenders, might have a material and adverse effect on the financial condition or operations of the
or the Guarantor or on the ability of the Borrower or Guarantor to comply with its obligations
Agreement.

Then, and in any such event, (a) if such event is an Event of Default specified in Se
automatically, the Commitment shall terminate and the Loans (with accrued interest thereon) an
amounts owing under this Agreement and the Note(s), shall immediately become due and pa
(b) if such event is any other Event of Default and, at any time thereafter, if any such Event of D
then be continuing, the Lender may, by written notice to the Borrower: (I) declare the princi
accrued interest on the Note together with all other amounts paya
Borrower to the Lender hereunder shall forthwith become, due and payable without presentment
protest or other notice of any kin, all of which are hereby waived by the Borrower and (ii) d
Commitment terminated, whereupon the Commitment of the Lender shall forthwith terminate im
Notwithstanding the exercise of either or both of the remedies set forth above, the Lender may
disbursements after the happening of any Event of Default without thereby waiving its right t
payment of the Note or to exercise any remedy hereunder or under the Note, and without liabili
any other or further disbursements.

8

# EXHIBIT D

## Section 8.      Miscellaneous

8.1     Payment of Expenses.  The Borrower agrees to pay and save the Lender harmless against li
payment of reasonable out-of-pocket expenses arising in connection with the preparation
delivery, administration and enforcement of this Agreement, the Note(s) and any do
transactions contemplated hereby, as well as any amendment, supplement or modification to,
any provision thereof including without limitation all sales, documentary, stamp and simila
assessments, and recording and filing fees charged by any governmental authority, and t
disbursements of counsel to the Lender. The Borrower will also reimburse the Lender for th
cost incurred with respect to this Agreement.

8.2     Amendment and Waiver.  Neither this Agreement nor any provision hereof may be amende
waived, discharged or terminated orally, but only by an instrument in writing signed by the p
whom enforcement of the amendment, change, waiver, discharge or termination is sought.

8.3     Governing Law.  This Agreement and the rights and obligations of the parties hereunder and
Note shall be construed in accordance with and be governed by the laws of the State of Illin
giving effect to any choice of law principles.

8.4     Notices.  Except as otherwise provided herein, all notices, requests, demands and other comm
which are required or permitted hereunder shall be in writing and shall be deemed to have been
(a) when delivered personally, (b) on the following Business Day when sent by overnight courie
date and time of receipt by the sender of the correct answer-back or notification of
transmission, as appropriate when sent by facsimile, and (d) on the third following Business
mailed by registered or certified mail, postage prepaid, return receipt requested as follows:

If to the Borrower, to:

PT Pabrik Kertas Tjiwi Kimia Tbk
Wisma BII Jalan MH Thamrin  Kav 22
Jakarta, Pusat 01350
Indonesia
Attention: Mr. Ronny Kurniawan

If to the Lender, to:

Beloit Corporation
1 St. Lawrence Avenue
Beloit, Wisconsin  53511
U.S.A.
Attention: Victor F. Pocius
Fax:  (608) 364-1747

or to such other address as may be specified in a notice given by one party to the other.

8.5     Waiver, Etc.  No failure or delay on the part of the Lender in exercising any right, power or privil
this Agreement or the Note(s) and no course of dealing between the Borrower and the Le
operate as a waiver thereof; no shall any single or partial exercise of any right, power or
hereunder preclude any other or further exercise thereof or the exercise of any other right,
privilege.  The rights and remedies herein expressly provided are cumulative and not exclusi
rights or remedies which the Lender would otherwise have pursuant to law or equity.  No no
demand on the Borrower in any case shall entitle the Borrower to any other or further notice or d
similar or other circumstances or constitute a waiver of the right of the Lender to any other or furth
in any circumstances without notice or demand.

8.6     Descriptive Heading, Etc.  The descriptive headings of the several sections of this Agreement are
for convenience only and shall not be deemed to affect the meaning or construction of ar
provisions hereof.

8.7     Benefit of Agreement.  This Agreement shall be binding upon the Borrower and shall inure to the b
the Lender and its successors and assigns.  The Lender may sub-participate, assign or transfer a
respective rights, benefits or obligations hereunder without the consent of the Borrower, and the E
hereby agrees and consents to such assignment.

9

8.8 <u>Domicile of Loans</u>. The Lender may transfer and carry the Loans at, to or for the account of office or subsidiary of the Lender. Any transfer instigated by the Lender shall not be at any withholding or other tax expense to the Borrower.

8.9 <u>Consent to Jurisdiction</u>. The Borrower or Guarantor hereby irrevocably agrees that any proceeding or claim against it arising out of, or relating in anyway to, this Agreement, the Note(s) or any transaction contemplated hereby or any judgment entered by any court in re may be brought and enforced in any Illinois State or Federal Court sitting in the City of Chic Borrower hereby irrevocably submits to the non-exclusive jurisdiction of such courts for the pu such suit, action, proceeding or claims. The Borrower hereby irrevocably waives, to the permitted by law, any objection which it may now or hereafter have to the laying of venue action or proceeding arising out of or relating to this Agreement, the Loans, the Note(s) or an contemplated hereby brought in any Illinois State or Federal Court sitting in the City of C hereby further irrevocably waives any claims that any such suit, action or proceeding brough court has been brought in an inconvenient forum. The Borrower further irrevocably consents process out of any of the aforementioned courts in any such suit, action, proceeding or mailing of copies thereof by certified air mail, postage prepaid to the Borrower at its addr above. THE LENDER AND THE BORROWER EACH HEREBY EXPRESSLY WAIVE AN MAY HAVE NOW OR HEREAFTER TO A JURY TRIAL IN ANY SUIT, ACTION OR PI ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE LOANS, THE NOTE, OR TRANSACTION CONTEMPLATED HEREBY.

8.10 <u>AAS</u>. Calculations hereunder shall be made and financial statements and data required he prepared, both as to classification of items and as to amount, in accordance with genera accounting standards in the Republic of Indonesia ("AAS") consistently applied, except expressly provided herein.

8.11 <u>Entire Agreement</u>. This Agreement and the Note embody the entire Agreement and understa the parties hereto with respect to the subject matter hereof and supersede all prior agr understandings between the parties hereto.

8.12 <u>Execution in Counterpart</u>. This Agreement may be executed in one or more counterparts, e when so executed and delivered shall be deemed to be an original and all of which taken t constitute one and the same instrument.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their du representatives as of the date first above written.

PT PABRIK KERTAS TJIWI KIMIA Tbk

By: _____

BELOIT CORPORATION

By: _____

ASIA PULP & PAPER COMPANY LIMITED

By: _____

10

NOTE : A004

## PT. PABRIK KERTAS TJIWI KIMIA Tbk.
## JAKARTA, INDONESIA

### PROMISSORY NOTE

US$16,213,352.95 April 25, 1998

FOR VALUE RECEIVED, PT. Pabrik Kertas Tjiwi Kimia Tbk (the "Borrower") by this promissory note ("Note") promises to pay to the order of Beloit Corporation (the "Lender"), the principal sum of US$16,213,352.95 (Sixteen Million Two Hundred Thirteen Thousand Three Hundred Fifty Two and $95/100$), in lawful currency of the United States, in installments as provided below, and to pay interest in like currency on the principal balance hereof from time to time outstanding, at an interest rate per annum equal to six (6) month London Interbank Offered Rate ("LIBOR") starting February 28, 1998, for comparable amounts as determined by the Lender (as defined above), plus two and one-eight percent (2.125%).

The principal of this Note is payable in eight (8) installments, the first one (1) of which shall be in the amount of US$578,352.95 (Five Hundred Seventy Eight Thousand Three Hundred Fifty Two and $95/100$), the second (2) of which shall be in the amount of US$635,000.00 (Six Hundred Thirty Five Thousand and $00/100$) with the final six (6) installments in the amount of US$2,500,000.00 (Two Million Five Hundred Thousand and $00/100$) each. First (1) installment will be due September 30, 1999 and semi-annually thereafter until paid in full.

Interest on this Note will accrue from February 28, 1998. First interest payment is due on September 30, 1998, and semi-annually thereafter. Interest shall be computed on the basis of the actual number of days elapsed, using a 360 day year.

Failure to pay any installment of principal and interest when due, with a grace period of 30 days in accordance with the terms of the credit agreement, shall mature the whole amount of the principal unpaid and accrued interest, and the same shall be due and payable, and said sum shall continue to accrue interest at the rate of LIBOR plus three and one-eight percent (LIBOR + 3.125%) until paid.

The Borrower hereby waives presentment, demand, notice or protest of any kind. This Note shall be governed by and construed in accordance with the Laws of the State of Illinois. This note may be prepaid at anytime by the borrower.

This Note may be transferred and shall be assignable to third parties, including, without limitation, The First National Bank of Chicago, and the Borrower hereby consents to any such transfer.

**PT. PABRIK KERTAS TJIWI KIMIA Tbk**

WITNESS : _____          BY    : _____
                                     TITLE : _____


**GUARANTEE**

FOR VALUE RECEIVED, the undersigned Asia Pulp & Paper Company Ltd, as primary obligor(s), hereby (jointly and severally) unconditionally guarantee(s) the prompt payment of principal and interest on the foregoing promissory note when and as due in accordance with its terms.

**ASIA PULP & PAPER COMPANY LTD.**

WITNESS: _____          BY    : _____
                                     TITLE : _____

# EXHIBIT E

# NOTE PURCHASE AGREEMENT

THIS NOTE PURCHASE AGREEMENT (the "Agreement"), entered into as of this __25__ day of April, 1998, is between BELOIT CORPORATION (the "Supplier"), a corporation duly organized under the laws of Delaware, and THE FIRST NATIONAL BANK OF CHICAGO (the "Lender"), a national banking association organized under the laws of the United States of America, acting through any of its branches or wholly-owned subsidiaries.

## WITNESSETH

WHEREAS, the Supplier has entered into separate contracts (the "Contract(s)") with PT Indah Kiat Pulp and Paper Corporation, a corporation duly organized under the laws of the Republic of Indonesia ("Indah Kiat") and PT Pabrik Kertas Tjiwi Kimia TBK, a corporation duly organized under the laws of the Republic of Indonesia ("Pabrik") (collectively, the "Buyer(s)"), whereby the Supplier will supply various paper machinery and equipment (the "Items") to the Buyers;

WHEREAS, the Supplier, the Buyers and Asia Pulp & Paper Company Ltd., as guarantor (the "Guarantor") have also entered into Credit Agreements dated as of April ___, 1998 (the "Credit Agreement(s)") wherein, pursuant to the terms and conditions contained therein, the Supplier has agreed to extend credit to the Buyers in an aggregate amount of up to U.S.$38,023,315 for the purpose of financing the payments due from the Buyers pursuant to the Contracts; and

WHEREAS, the Supplier desires to sell to the Lender, and the Lender desires to purchase from the Supplier, a portion of the obligations of the Buyers to pay the Supplier for the Items sold under the Contracts (the "Obligations") which obligations shall be evidenced by one or more promissory notes issued by and payable by the Buyers pursuant to the Credit Agreements (the "Notes(s)") up to an aggregate amount not exceeding U.S.$38,023,315 (U.S.$21,809,962 for Indah Kiat and U.S.$16,213,353 for Pabrik); and

WHEREAS, as support for the payment of the Notes, Exporters Insurance Company Limited (the "Insurer") will provide one or more insurance policies (collectively, the "Policy(ies)") for the benefit of the Lender, as insured, under which the Obligations will bear export insurance in an aggregate amount sufficient to cover seventy-eight and 26/100 percent (78.26%) of the Obligations;

NOW, THEREFORE, in consideration of the mutual promises herein contained and for other good and valuable consideration, the parties hereto agree as follows:

## ARTICLE I

### Note Purchase

Subject to the terms and conditions contained herein, the Lender hereby agrees to establish a U.S. Dollar note purchase facility (the "Note Purchase Facility") in favor of the Supplier in order to purchase with certain recourse as provided in this Agreement, an ownership interest in and to a portion of the Notes (and all Obligations related thereto) issued by the Buyers in favor of the Supplier up to the aggregate amount of U.S.$38,023,315 (the "Facility Amount"). The Lender hereby agrees to purchase from the Supplier and the Supplier agrees to sell to the Lender the Obligations payable to the Supplier. The Lender's commitment is specifically limited, in respect of the Obligations, to an amount not to exceed the Facility Amount.

## ARTICLE II

### Terms of the Note Purchase Facility

A.   **The Note(s)**.   The Buyers' Obligations shall be evidenced by the Note(s) which shall be in form and substance satisfactory to the Lender.

B.   **Purchase of Note(s)**.   The purchase of the Note(s) shall be made by the Lender from time to time during the availability period, which shall commence from the effective date hereof to and until the date falling one calendar month thereafter (the "Availability Period") for an amount not exceeding the Facility Amount at any one time outstanding.  In the event that the Notes are not purchased during the Availability Period, the Facility shall be terminated.  Upon the presentation of all conditions precedent for purchase in form and substance satisfactory to the Lender as contained in this Agreement, the Lender shall pay to the Supplier the face amount of any such Note. In connection with any purchase hereunder, the Supplier must deliver, no less than two (2) banking days prior to any intended note purchase, to the Lender a notice (the "Notice and Endorsement") in the form of Annex A attached hereto specifying the Notes to be purchased and the date of anticipated purchase as well as the Supplier's endorsement over to the Lender of the relevant portion of the Supplier's interest in such Notes.

C.   **Interest**.   Interest shall accrue on all outstanding Obligations calculated with reference to the sum of LIBOR (as hereinafter defined) plus 1.25% per annum, computed on the basis of the actual number of days elapsed (including the first day but excluding the last day), using a 360-day year.  It is contemplated that the Note(s) shall provide for full repayment of principal no later than the date falling five (5) calendar years from the effective date hereof.  As used herein:

"Banking Day" shall mean (a) with respect to determining an applicable LIBOR rate, a day other than a Saturday or Sunday on which banks are open for business in Chicago, Illinois and on which dealings in Dollars are carried on in the London interbank market and (b) for all other purposes, a day other than Saturday or Sunday on which banks are open for business in Chicago, Illinois.

"LIBOR" shall mean, with respect to an Obligation for an Interest Period, the rate

at which deposits in Dollars for a period approximately equal to such Interest Period and in an amount approximately equal to such Obligation are offered by the Lender to first-class banks in the London interbank market at approximately 11:00 a.m. (London time) two Banking Days prior to the first day of such Interest Period.

"Interest Period" shall mean, with respect to an Obligation, a period of six months commencing on a Payment Date or, in the case of the initial Interest Period of an Obligation, on the date on which the Obligation was created, and ending on the next succeeding Payment Date.

"Payment Date" shall mean a date upon which principal and/or interest is payable pursuant to a Note.

D. Fees/Premiums/Expenses. The Lender shall be entitled to receive and the Supplier hereby agrees to pay to the Lender on the date of execution of this Note Purchase Agreement, an arrangement fee equal to 0.75% flat calculated with reference to the aggregate Facility Amount. In addition, the Supplier shall be responsible for and hereby agrees to reimburse the Lender for any and all insurance premiums payable to the Insurer under the Policies.

In addition, the Supplier hereby agrees to indemnify and hold the Lender harmless from and against any and all losses, costs or expenses suffered as a result of (i) the implementation of or any change in any law or regulation, or any guideline or directive (whether or not having the force of law) or the interpretation thereof by any authority charged with the administration thereof subjects the Supplier or the Lender to any tax with respect to the Credit Agreement, the Note(s) or any amount payable hereunder or thereunder or changes the basis of taxation of any such payment to the Lender or the Supplier or imposes, modifies or deems applicable any reserve or special deposit requirement against or in respect of assets or liabilities of, or deposits with or for the account of, or loans or credit extended by, the Supplier or the Lender; (ii) the adoption of any law or any governmental rule, regulation, policy, guideline or directive (whether or not having the force of law), or any change in the interpretation or administration thereof by any governmental authority which subjects the Supplier or the Lender to any taxes, or changes the basis of taxation of payments, or imposes or increases or deems applicable any reserve, assessment, insurance charge, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, the Supplier or the Lender.

E. Method of Payment. Upon purchase and assignment of the Note(s) hereunder, the Buyers shall be obligated to pay to the Supplier the amounts payable pursuant to the Note(s) and the Supplier shall be obligated to repay the obligations arising hereunder to the Lender, on the Payment Dates specified in the Note(s) in immediately available U.S. Dollars to the Lender (ABA 071000013) for further credit to GTS Settlement Account no. 10-46187 (Reference: Beloit) at the head office of the Lender at the address set forth on the signature page of this Agreement (or to such other account or accounts as the Lender may specify). Whenever any payment under this Agreement shall be stated to be due and payable on a day other than a Banking Day, such payment shall be made on the next succeeding Banking Day and such extension of time shall be included in the computation of any interest or fee due thereon. The Supplier is hereby designated

and hereby agrees to act as the Lender's agent for the receipt of payments made by the Buyers pursuant to the Note(s).

F. Overdue Interest. Interest shall accrue on all overdue and unpaid outstanding obligations under the Notes for any period from the Payment Date of any obligation to the date such obligation is paid in full, at a rate per annum equal to LIBOR plus three and 12.5/100 percent (3.125%). Each such rate shall be computed on the basis of the actual number of days elapsed during the Interest Period (including the first day but excluding the last day), using a 360-day year.

## ARTICLE III

### Conditions Precedent

A. Conditions to Note Purchase. As conditions precedent to the Note purchase and for any renewal or extension of this Agreement, the following shall have been received by the Lender, in form and substance satisfactory to it:

(1) Representations and Warranties. All the representations and warranties made by the Supplier in this Agreement or in connection herewith shall be true with the same effect as though such representations and warranties had been made on and as of such date.

(2) Note(s). The original executed versions of the Notes(s), duly signed by authorized signatories of the Buyers.

(3) Notice and Endorsement. A Notice and Endorsement, signed by a duly authorized officer of the Supplier, substantially in the form of Annex A attached hereto.

(4) Contracts. A copy of the Contracts (or a relevant extract thereof) for the Items being sold by the Supplier to the Buyers.

(5) Supplier Certificate. A Certificate of the Secretary or Assistant Secretary of the Supplier certifying the authority of the Supplier to enter into this Agreement, and containing the names, specimen signatures and evidence of authority of the persons who will sign this Agreement and the other documents required by this Agreement, or will otherwise act as representatives of the Supplier.

(6) Policies. The duly executed Insurance Policies issued by the Insurer in full force and effect and in form and substance satisfactory to the Lender.

(7) Conditions Precedent to Credit Agreements. Copies of each duly executed Credit Agreement and every condition precedent listed in section 4.3 of the Credit Agreements, including, without limitation, a copy of the duly executed guarantee of the Guarantor, evidence certifying the authority of the Buyers to enter into the Contract and incur theObligations under the Note(s), containing the names, specimen signatures and evidence

of authority of the persons who will sign the Note(s) and an opinion of counsel to the Buyers and the Guarantor.

## ARTICLE IV

### Representations and Warranties; Covenants

A. <u>Representations and Warranties</u>. The Supplier represents and warrants to the Lender, until the Obligations have been paid in full, as follows:

(1)  <u>Authorization and Validity.</u> The Supplier has all requisite legal authority to sign this Note Purchase Agreement. This Agreement constitutes a valid and binding general obligation of the Supplier, enforceable against the Supplier in accordance with its terms.

(2)  <u>Compliance with Laws and Contracts.</u> Neither the execution and delivery by the Supplier of this Agreement, the consummation of the transactions herein contemplated, nor compliance with the provisions thereof will violate any material law, rule, regulation, order, writ, judgment, injunction, decree or award binding on the Supplier or the provisions of any indenture, instrument or agreement to which the Supplier is a party or is subject, or by which it, or its property, is bound, or conflict with or constitute a default thereunder, or result in the creation or imposition of any lien or encumbrance pursuant to the terms of any such indenture, instrument or agreement.

B. <u>Affirmative Covenants</u>. The Supplier covenants and agrees that until all amounts owing under this Agreement have been paid in full, it will, unless the Lender otherwise consents in writing:

(1)  <u>Cooperation.</u> Fully cooperate with the Lender in any reasonable collection efforts against the Buyers, the Guarantor or the Insurer, including, without limitation, producing any documents or other instruments reasonably requested by the Lender.

(2)  <u>Policies.</u> Do all things necessary to maintain the Policies in full force and effect, including, without limitation, reimbursing the Lender for any and all premiums paid by the Lender to the Insurer when and as they become due.

(3)  <u>Delivery of Documents</u>. Deliver to the Lender copies of all documents and instruments required to be delivered by the Buyers to the Supplier pursuant to the Credit Agreements, including, without limitation, financial statements.

(4)  <u>Assignments</u>. Not sell, assign, transfer or otherwise dispose of its interest in the Note(s), except to the Lender or upon the Lender's prior written consent.

## ARTICLE V

Termination and Repurchase.

(1) In the event that the Supplier breaches or otherwise fails to comply with the terms and conditions of this Agreement, until all amounts payable under the Notes have been satisfied in full, then the Supplier hereby agrees to repurchase immediately from the Lender, upon demand by the Lender, without recourse of any kind, the Obligations of the Buyer therein expressed for a repurchase price equal to the amount funded by the Lender plus the accrued interest until the date of repurchase.

(2) In the event that a Buyer breaches or otherwise fails to comply with the terms and conditions of the Notes, including, without limitation, making payment in full or in part on any and all Payment Dates until all amounts payable under the Notes have been satisfied in full, then the Supplier hereby agrees to repurchase from the Lender, upon demand by the Lender, without recourse of any kind, twenty-one and 74/100 percent (21.74%) of the Obligations of such Buyer for which such Buyer is in breach thereof for a repurchase price equal to 21.74% of the amount funded by the Lender plus the accrued interest until the date of repurchase.

(3) The remaining seventy-eight and 26/100 percent (78.26%) of the Obligation(s) in breach shall be covered by the Policy. In the event that a Buyer breaches or fails to comply with the terms and conditions of a Note and/or the Insurer does not, after any applicable waiting period, make payment pursuant to the terms of the Policy or otherwise breaches or fails to comply with the terms and conditions of the Policy for any reason other than the insolvency of the Insurer or due to the negligence or willful misconduct by the Lender, then the Supplier hereby agrees to repurchase immediately from the Lender, upon demand by the Lender, without recourse of any kind, the remaining 78.26% of the Obligations of the relevant Buyer in breach for a repurchase price equal to 78.26% of the amount funded by the Lender plus the accrued interest until the date of repurchase.

## ARTICLE VI

### Jurisdiction

Submission to Jurisdiction. The Lender and the Supplier irrevocably agree that any legal action or proceeding arising out of or relating to this Agreement may be instituted in the United States of America in any Federal or State court sitting in the State of Illinois, and the Lender and the Supplier, in respect of themselves and its properties and revenues, irrevocably submits to the jurisdiction of these courts in any such action or proceeding. The foregoing provisions shall not limit the right of the Lender to bring any such action or proceeding or to obtain execution on any judgment rendered in any such action or proceeding in any other appropriate jurisdiction or in any other manner.

## ARTICLE VII

### Miscellaneous

A. Disposition of Indebtedness. After the purchase hereunder, following prior written notice to the Supplier, the Lender may sell, transfer, pledge, negotiate, grant participations in or otherwise dispose of all or any part of the Obligations or Note(s) purchased by the Lender under this Agreement to any party without increasing the Supplier's obligations hereunder, and any such party shall enjoy all the rights, privileges, and obligations of the Lender under this Agreement with respect to such transferred Note(s).

B. Disclaimer. The Lender shall not be responsible in any way for the performance of the underlying Contracts between the Buyers and the Supplier, and no claim against the Supplier of any Item or any other person with respect to the performance of the such purchase contract will affect the obligations of the Supplier hereunder.

C. Benefit of Agreement. This Agreement shall inure to the benfit of the parites hereto and their respective successors and assigns and shall be effective from the date of execution hereof to and until the date upon which all Obligations and any other amounts payable to the Lender have been paid in full..

D. Governing Law. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Illinois, United States of America.

E. Communications. All communications under this Agreement, including reports, shall be in writing, in the English language addressed to the appropriate party at the address set forth under its name on the signature page of this Agreement, and shall be deemed given when received by the recipient.

IN WITNESS WHEREOF, the parties to this Agreement have caused this Agreement to be duly executed and delivered in the United States of America as of the date first above written.

THE FIRST NATIONAL BANK OF CHICAGO

By: _____

Title: _First Vice President_

BELOIT CORPORATION

By: _____

Title: _DIRECTOR, TREASURY OPERATIONS_
_ASSISTANT TREASURER._

# EXHIBIT F

**BELOIT** *CORPORATION*

Beloit C
I St. Lawren
Beloit, Wisconsin 5
Telephone 60
FAX 60

# ANNEX A

## FORM OF NOTICE AND ENDORSEMENT

The First National Bank of Chicago
One First National Plaza
Chicago, Illinois 60670

Attention:     Mr. Frank Bukowski

Subject:      PT Inah Kiat and
              PT Pabrik Kertas

Pursuant to that certain Note Purchase Agreement dated as of April 25, 1998, (the "Agreement") by and between Beloit Corporation (the "Supplier") and The First National Bank of Chicago (the "Lender"), the supplier does hereby give notice that it desires that the Lender purchase the Note(s) identified on the attached schedule representing insured obligations of the Buyer in an amount equal in the aggregate to $38,023,315.00 (the "Note Purchase Price"). The date of the desired purchase is _May 5_____, 199 8. Such Obligations shall mature on the payment date(s) specified in the Note(s), which date(s) are recorded on the attached schedule. Simultaneous with the supplier's receipt from the Lender of payment of the Note Purchase Price, the Supplier shall be deemed to have endorsed such Notes to the order of the Lender, and pursuant to the terms of the Agreement, hereby assigned and transferred all of its right, title and interest in, to and under the relevant portion of such Notes and the Obligation evidenced thereby, to the Lender with recourse to the extent set forth in the Agreement (except that nothing in this Endorsement shall prejudice the rights of the Lender or any transferee against the Supplier to the extent set forth in the Agreement or in connection with the representations or warranties made by the Supplier in said Agreement or any documents submitted pursuant thereto).

BELOIT CORPORATION

By: _____

Title: _DIRECTOR TREASURY OPERATION_
_ASSISTANT TREASURER_

Date: _4/29/98_

Attachment: Note Breakdown

**BELOIT** *CORPO* ` TION `

Beloit Co. J.
1 St. Lawrence
Beloit, Wisconsin 5351
Telephone 608 36
FAX 608 36

# NOTE SCHEDULE

| | |
|---|---|
| PT Indah Kiat -- Note No. A003 | $21,809,962.00 |
| PT Pabrik Kertas -- Note No. A004 | $16,213,353.00 |
| | $38,022,315.00 |

A Harnischfeger Industries Company

# EXHIBIT G

## AMENDMENT TO CREDIT AGREEMENT

This Amendment (the "Amendment") is dated as of September 24, 1998 among PT Indah Kiat Pulp & Paper Corporation TbK (the "Borrower"), Asia Pulp & Paper Company Ltd. (the "Guarantor") and Beloit Corporation (the "Lender").

## WITNESSETH:

WHEREAS, the Borrower, the Guarantor and the Lender are parties to that certain Credit Agreement dated as of April 25, 1998 (the "Agreement"); and

WHEREAS, the Borrower, the Guarantor and the Lender desire to amend the Agreement and increase the Commitment in certain respects more fully described hereinafter

NOW, THEREFORE, in consideration of the premises herein contained, and for other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.      Defined Terms. Capitalized terms used herein and not otherwise defined herein shall have the meanings attributed to such terms in the Agreement.

2.      Amendments to the Agreement.

2.1.    The definition of "Interest Rate" in Section 1.8 of the Agreement shall be deleted in its entirety and inserted in lieu thereof shall be the following: "Interest Rate" shall mean for each Interest Period, the sum of 2.29% per annum and the LIBOR Rate defined hereunder.

2.2.    The definition of "Commitment" in Section 2.1 of the Agreement shall be amended by deleting "U.S.$21,809,962" in its entirety and inserting in lieu thereof "U.S.$26,701,678 (Twenty-Six Million Seven Hundred One Thousand Six Hundred Seventy Eight United States Dollars)".

3.      In consideration of the amendments to the Agreement, the Borrower agrees to pay to the Lender, in connection with this Amendment, an arrangement fee equal to 0.75% of the aggregate increased amount of the Commitment (U.S.$4,891,716), payable upon execution of this Amendment.

4.      Ratification of Guarantee. The Guarantor acknowledges, agrees and confirms that the Borrower's obligations to the Lender under the Agreement, as hereby amended, are and remain unconditionally guaranteed by the Guarantor pursuant to the terms of Section 1 of the Agreement.

5.    Representations and Warranties. In order to induce the Lender to enter into this Amendment, the Borrower represents and warrants that:

5.1.    The representations and warranties set forth in Section 5 of the Agreement, hereby amended, are true, correct and complete on the date hereof as if made on and as of the date hereof and that there exists no Event of Default on the date hereof.

5.2.    The execution and delivery by the Borrower of this Amendment have been duly authorized by proper corporate proceedings of the Borrower and this Amendment, and the Agreement, as amended by this Amendment, constitute the legal, valid and binding obligations of the Borrower enforceable against the Borrower in accordance with their terms except as enforceability may be limited by bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally. .

5.3.    Neither the execution and delivery by the Borrower of this Amendment, nor the consummation of the transactions herein contemplated, nor compliance with the provisions hereof will violate any law, rule, regulation, order, writ, judgment, injunction, decree or award binding on the Borrower or the Borrower's articles or certificate of incorporation, partnership agreement, certificate of partnership, articles or certificate of organization, by-laws, or operating or other management agreement, as the case may be, or the provisions of any indenture, instrument or agreement to which the Borrower is a party or is subject, or by which it or its property, is bound, or conflict with or constitute a default thereunder.

6.    Effective Date. This Amendment shall become effective as of the date first above written upon receipt by the Lender of counterparts of this Amendment duly executed by the Borrower and the Lender and receipt of new promissory notes reflecting the amended aggregate Commitment.

7.    Ratification. The Agreement, as amended hereby, shall remain in full force and effect and is hereby ratified, approved and confirmed in all respects.

8.    Reference to Agreement. From and after the effective date, each reference in the Agreement to "this Agreement", "hereof", or "hereunder" or words of like import, and all references to the Agreement in any and all agreements, instruments, documents, notes, certificates and other writings of every kind and nature shall be deemed to mean the Agreement, as amended by this Amendment.

9.    Choice of Law. This Amendment shall be construed in accordance with the laws of the State of Illinois, U.S.A.

10.    Execution in Counterparts. This Amendment may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

IN WITNESS WHEREOF, the Borrower, the Guarantor and the Lender have executed this Amendment as of the date first above written.

P.T. INDAH KIAT PULP & PAPER CORPORATION

By: 

Title:

ASIA PULP & PAPER COMPANY, LTD.

By:

Title:

BELOIT CORPORATION

By:

Title: Executive Vice President

# EXHIBIT H

### PT. INDAH KIAT PULP & PAPER CORPORATION Tbk
### JAKARTA, INDONESIA

---

### PROMISSORY NOTE

US$26,701,678

September 24, 199_

FOR VALUE RECEIVED, PT Indah Kiat Pulp & Paper Corporation (the "Borrower") by this promissory note ("Note") promises to pay to the order of Beloit Corporation (the "Lender"), the principal sum of US$26,701,678 ("Twenty Six Million Hundred One Thousand Six Hundred Seventy-Eight and **/100), in lawful currency of United States, in installments as provided below, and to pay interest in like currency on principal balance hereof from time to time outstanding, at an interest rate per annum ec six (6) month, London Interbank Offered Rate (LIBOR"), for comparable amounts as determined by the Lender (as defined above), plus two and 29/100 percent (2.29%).

The principal of this Note is payable in eight (8) installments, the first one (1) of which shall be in the amount of US$1,444,604.00 (One Million Four Hundred Forty-F Thousand Six Hundred Four and **/100), the second (2) of which shall be in the amou US$1,348,010.00 (One Million Three Hundred Forty-Eight Thousand Ten and **/100 the final six (6) installments in the amount of US$3,984,844.00 (Three Million Nine H Eighty-Four Thousand Eight Hundred Forty-Four and **/100) each . First (1) installm will be due September 30, 1999, and semi-annually thereafter until paid in full. The fi interest payment is due on September 30, 1998, and semi-annually thereafter. Interest be computed on the basis of the actual number of days elapsed, using a 360 day year.

Failure to pay any installment of principal and interest when due, with a grace of 30 days in accordance with the terms of the credit agreement, shall mature the whole amount of the principal unpaid and accrued interest, and the same shall be due and pay and said sum shall continue to accrue interest at the rate of LIBOR plus three and one-percent (LIBOR + 3.125%) until paid.

The Borrower hereby waives presentment, demand, notice or protest of any kin This Note shall be governed by and construed in accordance with the Laws of the State Illinois. This note may be prepaid at any time by the Borrower.

This Note may be transferred and shall be assignable to third parties, including, without limitation, The First National Bank of Chicago, and the Borrower hereby conse~ any such transfer.

PT. INDAH KIAT PULP & PAPER CORPORATION T

By: _____

WITNESS: _____          Title: _____


## GUARANTEE

FOR VALUE RECEIVED, the undersigned Asia Pulp & Paper Company Ltd., as prim obligor(s), hereby (jointly and severally) unconditionally guarantee(s) the prompt payn principal and interest on the foregoing promissory note when and as due in accordance its terms.


ASIA PULP & PAPER COMPANY LTD.


WITNESS: _____          BY: _____

TITLE: _____

# EXHIBIT
# I

## AMENDMENT TO CREDIT AGREEMENT

This Amendment (the "Amendment") is dated as of September 14, 1998 among P
Pabrik Kertas Tjiwi Kimia TbK (the "Borrower"), Asia Pulp & Paper Company Ltd. (the
"Guarantor") and Beloit Corporation (the "Lender").

## WITNESSETH:

WHEREAS, the Borrower, the Guarantor and the Lender are parties to that certain
Credit Agreement dated as of April 25, 1998 (the "Agreement"); and

WHEREAS, the Borrower, the Guarantor and the Lender desire to amend the
Agreement and increase the Commitment in certain respects more fully described herein;

NOW, THEREFORE, in consideration of the premises herein contained, and for o
good and valuable consideration, the receipt of which is hereby acknowledged, the partie
hereto hereby agree as follows:

1.      Defined Terms. Capitalized terms used herein and not otherwise defined
herein shall have the meanings attributed to such terms in the Agreement.

2.      Amendments to the Agreement.

2.1.    The definition of "Interest Rate" in Section 1.8 of the Agreement shall be
deleted in its entirety and inserted in lieu thereof shall be the following: "Interest Rate" s
mean for each Interest Period, the sum of 2.17% per annum and the LIBOR Rate defined
hereunder.

2.2.    The definition of "Commitment" in Section 2.1 of the Agreement shall be
amended by deleting "U.S.$16,213,352.95" in its entirety and inserting in lieu thereof
"U.S.$17,123,488.95 (Seventeen Million One Hundred Twenty-Three Thousand Four
Hundred Eighty-Eight and 95/100 United States Dollars)".

3.      In consideration of the amendments to the Agreement, the Borrower agre
pay to the Lender, in connection with this Amendment, an arrangement fee equal to 0.75
the aggregate increased amount of the Commitment (U.S.$910,136), payable upon execu
of this Amendment.

4.      Ratification of Guarantee. The Guarantor acknowledges, agrees and con
that the Borrower's obligations to the Lender under the Agreement, as hereby amended,
and remain unconditionally guaranteed by the Guarantor pursuant to the terms of Sectio
of the Agreement.

5.    Representations and Warranties. In order to induce the Lender to enter into this Amendment, the Borrower represents and warrants that:

5.1.    The representations and warranties set forth in Section 5 of the Agreement, hereby amended, are true, correct and complete on the date hereof as if made on and as of the date hereof and that there exists no Event of Default on the date hereof.

5.2.    The execution and delivery by the Borrower of this Amendment have been duly authorized by proper corporate proceedings of the Borrower and this Amendment, and the Agreement, as amended by this Amendment, constitute the legal, valid and binding obligations of the Borrower enforceable against the Borrower in accordance with their terms, except as enforceability may be limited by bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally.

5.3.    Neither the execution and delivery by the Borrower of this Amendment, nor the consummation of the transactions herein contemplated, nor compliance with the provisions hereof will violate any law, rule, regulation, order, writ, judgment, injunction, decree or award binding on the Borrower or the Borrower's articles or certificate of incorporation, partnership agreement, certificate of partnership, articles or certificate of organization, by-laws, or operating or other management agreement, as the case may be, or the provisions of any indenture, instrument or agreement to which the Borrower is a party or is subject, or by which it or its property, is bound, or conflict with or constitute a default thereunder.

6.    Effective Date. This Amendment shall become effective as of the date first above written upon receipt by the Lender of counterparts of this Amendment duly executed by the Borrower and the Lender and new promissory notes in the amended aggregate Commitment.

7.    Ratification. The Agreement, as amended hereby, shall remain in full force and effect and is hereby ratified, approved and confirmed in all respects.

8.    Reference to Agreement. From and after the effective date, each reference in the Agreement to "this Agreement", "hereof", or "hereunder" or words of like import, and all references to the Agreement in any and all agreements, instruments, documents, notes, certificates and other writings of every kind and nature shall be deemed to mean the Agreement, as amended by this Amendment.

9.    Choice of Law. This Amendment shall be construed in accordance with the laws of the State of Illinois, U.S.A.

10.    Execution in Counterparts. This Amendment may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

IN WITNESS WHEREOF, the Borrower, the Guarantor and the Lender have executed this Amendment as of the date first above written.

P.T. PABRIK KERTAS TJIWI KIMIA TBK

By: Ronny Kurniawan

Title:

ASIA PULP & PAPER COMPANY, LTD.

By:

Title:

BELOIT CORPORATION

By:

Title: Executive Vice President

# EXHIBIT J

PT PABRIK KERTAS TJIWI KIMIA Tbk
JAKARTA, INDONESIA

## PROMISSORY NOTE

US$17,123,188.95

September 24, 1998

FOR VALUE RECEIVED, PT Pabrik Kertas Tjiwi Kimia Tbk (the "Borrower") by this promissory note ("Note") promises to pay to the order of Beloit Corporation (the "Lender"), the principal sum of US$17,123,488.95 ("Seventeen Million One Hundred Twenty-Three Thousand Four Hundred Eighty-Eight and 95/100), in lawful currency of the United States, in installments provided below, and to pay interest in like currency on the principal balance hereof from time to time outstanding, at an interest rate per annum equal to six (6) month, London Interbank Offered Rate ("LIBOR"), for comparable amounts as determined by the Lender (as defined above), plus two and 17/100 percent (2.17%).

The principal of this Note is payable in eight (8) installments, the first one (1) of which shall be in the amount of US$627,592.95 (Six Hundred Twenty-Seven Thousand Five Hundred Ninety-Two and 95/100), the second (2) of which shall be in the amount of US$681,144.00 (Six Hundred Eighty-One Thousand One Hundred Forty-Four and **/100) with the final six (6) installments in the amount of US$2,635,792.00 (Two Million Six Hundred Thirty-Five Thousand Seven Hundred Ninety-Two and **/100) each . First (1) installment will be due September 30, 1999, and semi-annually thereafter until paid in full. First interest payment is due on September 30, 1998, and semi-annually thereafter. Interest shall be computed on the basis of the actual number of days elapsed using a 360 day year.

Failure to pay any installment of principal and interest when due, with a grace period of days in accordance with the terms of the credit agreement, shall mature the whole amount of the principal unpaid and accrued interest, and the same shall be due and payable, and said sum shall continue to accrue interest at the rate of LIBOR plus three and one-eight percent (LIBOR + 3 1/8) until paid.

The Borrower hereby waives presentment, demand, notice or protest of any kind. This Note shall be governed by and construed in accordance with the Laws of the State of Illinois. This Note may be prepaid at any time by the borrower

This Note may be transferred and shall be assignable to third parties, including, without limitation, The First National Bank of Chicago, and the Borrower hereby consents to any such transfer.

PT PABRIK KERTAS TJIWI KIMIA Tbk

By: _____ RONNY Kurniawan

WITNESS: _____    TITLE: _____

## GUARANTEE

FOR VALUE RECEIVED, the undersigned Asia Pulp & Paper Company Ltd., as primary obligor hereby (jointly and severally) unconditionally guarantee(s) the prompt payment of principal and interest on the foregoing promissory note when and as due in accordance with its terms.

ASIA PULP & PAPER COMPANY LTD.

WITNESS: _____    BY: _____

TITLE: _____

# EXHIBIT
# K

AMENDMENT NO 1 TO NOTE PURCHASE AGREEMENT

This Amendment No. 1 (the "Amendment") is dated as of September 30, 1998 among BELOIT CORPORATION (the "Supplier") and The First National Bank of Chicago (the "Lender")

### WITNESSETH

WHEREAS, the Supplier and the Lender are parties to that certain Note Purchase Agreement dated as of April 25, 1998 (the "Agreement"); and

WHEREAS, the Supplier and the Lender desire to amend the Agreement in certain respects more fully described hereinafter;

NOW, THEREFORE, in consideration of the premises herein contained, and for other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.      Defined Terms.  Capitalized terms used herein and not otherwise defined herein shall have the meanings attributed to such terms in the Agreement.

2.      Amendments to the Agreement.

2.1.    The second WHEREAS clause shall be amended by deleting the amount "U.S.$38,023,315 on the fifth line thereof and inserting in lieu thereof "U.S.$43,825,167."

2.2.    The third WHEREAS clause shall be amended by deleting the amounts "U.S.$38,023,315 (U.S.$21,809,962 for Indah Kiat and U.S.$16,213,353 for Pabrik)" in the 6th and 7th lines thereof and inserting in lieu thereof "U.S.$43,825,167 (U.S.$26,701,678 for Indah Kiat and U.S.$17,123,489 for Pabrik)"

2.3.    The fourth WHEREAS clause shall be amended by deleting "seventy-eight and 26/100 percent (78.26%)" in the 4th line thereof and inserting in lieu thereof "79.14%"

2.4.    The definition of "Commitment" in Section 2.1 of the Agreement (and each and every other reference to the Commitment) shall be amended by deleting "U.S.$38,023,315" in its entirety and inserting in lieu thereof "U.S.$43,825,167 ".

2.5.    Article 5 shall be amended in the second and third clauses thereof by deleting "21.74%" wherever it appears and inserting in lieu thereof "20.86%" and by deleting "78.26%" wherever it appears and inserting in lieu thereof "79 14%".

3.      In consideration of the amendments to the Agreement, the Supplier agrees to pay to the Lender, in connection with this Amendment, an arrangement fee equal to 0 75% of the aggregate increased amount of the Commitment, payable upon execution of this Amendment.

4.      Representations and Warranties.  In order to induce the Lender to enter into this Amendment, the Supplier represents and warrants that:

4.1.    The representations and warranties set forth in Article IV of the Agreement, as hereby amended, are true, correct and complete on the date hereof as if made on and as of the date hereof and that there exists no default on the date hereof.

4.2.    The execution and delivery by the Supplier of this Amendment have been duly authorized by proper corporate proceedings of the Supplier and this Amendment, and the Agreement, as amended by this Amendment, constitute the legal, valid and binding obligations of the Supplier enforceable

against the Supplier in accordance with their terms, except as enforceability may be limited by bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally.

4.3. Neither the execution and delivery by the Supplier of this Amendment, nor the consummation of the transactions herein contemplated, nor compliance with the provisions hereof will violate any law, rule, regulation, order, writ, judgment, injunction, decree or award binding on the Supplier or the Supplier's articles or certificate of incorporation, partnership agreement, certificate of partnership, articles or certificate of organization, by-laws, or operating or other management agreement, as the case may be, or the provisions of any indenture, instrument or agreement to which the Supplier is a party or is subject, or by which it or its property, is bound, or conflict with or constitute a default thereunder.

5. Ratification. The Agreement, as amended hereby, shall remain in full force and effect and is hereby ratified, approved and confirmed in all respects.

6. Reference to Agreement. From and after the Effective Date, each reference in the Agreement to "this Agreement", "hereof", or "hereunder" or words of like import, and all references to the Agreement in any and all agreements, instruments, documents, notes, certificates and other writings of every kind and nature shall be deemed to mean the Agreement, as amended by this Amendment.

7. Choice of Law. This Amendment shall be governed by and construed in accordance with the laws of the State of Illinois.

IN WITNESS WHEREOF, the Supplier and the Lender have executed this Amendment as of the date first above written.

BELOIT CORPORATION

By: _____

Title: As't Treasurer

THE FIRST NATIONAL BANK OF CHICAGO

By _____

Title Vice President

# EXHIBIT
# L



**BELOIT** C O R P O R A T I O N

Beloit Corp
1 St. Lawrence A
Beloit, Wisconsin 5351
Telephone 608 36
FAX 608 36

### ANNEX A
### FORM OF NOTICE AND ENDORSEMENT

September 30, 1998

Ms. Susan Moy
The First National Bank of Chicago
One First National Plaza
Chicago, Illinois 60670

Subject:  PT Indah Kiat Pulp & Paper Corporation TBK and
          PT Pabrik Kertas Tjiwi Kimia TBK

Dear Ms. Moy:

Pursuant to that certain Receivables Purchase Agreement dated as of
_September 30_, 1998 (the "Agreement"), by and between Beloit Corporation (the
"Supplier"), and The First National Bank of Chicago (the "Lender"), the Supplier does hereby
give notice that it desires that the Lender purchase the receivables identified on the attached
schedule representing obligations of the Buyer to the Supplier equal in the aggregate to
$43,825,167 (the increase of which is $5,801,852).

The date of the desired purchase is _October 2_, 1998. Such Obligations
shall mature on the payment dates which are recorded on the attached schedule.
Simultaneous with the Supplier's receipt from the Lender of payment of the Purchase Price,
the Supplier shall be deemed to have endorsed such receivables to the order of the Lender,
and pursuant to the terms of the Agreement, hereby assigned and transferred all of its right,
title and interest in, to and under such receivables and the Obligation evidenced thereby, to
the Lender with recourse to the extent set forth in the Agreement (except that nothing in this
Endorsement shall prejudice the rights of the Lender or any transferee against
the Supplier to the extent set forth in the Agreement or in connection with the
representations or warranties made by the Supplier in said Agreement or any documents
submitted pursuant thereto).

BELOIT CORPORATION

By: _____
      V. F. Bodus

Title:   Director, Treasury Operations
        & Assistant Treasurer

Date:   September 30, 1998

A Harnischfeger Industries Company

# EXHIBIT M



Managed Assets Department
Telephone:   312.732.2733
Fax:              312.732.1775
E-Mail:        Ronnie_D_Kaplan@bankone.com

Ronnie Kaplan
First Vice President

September 14, 2001

**Via Facsimile and Registered Mail**

PT Indah Kiat Pulp & Paper Corporation Tbk
Wisma BII Jalan MH Thamrin Kav 22
Jakarta, Pusat 01350
Republic of Indonesia

PT Indah Kiat Pulp & Paper Corporation Tbk
Wisma Indah Kiat, Gedung B. Lantai 4B
Jalan Raya Serpong Km 8
Tangerang, 15310 Jawa Barat
Republic of Indonesia
Fax No. 62-21-334979

PT Indah Kiat Pulp & Paper Corporation Tbk
Plaza BII, Tower II, 9th Floor
Jalan M.H. Thamrin No. 51
Jakarta 103050
Republic of Indonesia
Fax No. 62-21-392-6179

Attention:  Mr. Ronny Kurniawan

    Re:  Notice of Default  (Indah Kiat)

Dear Mr. Kurniawan:

We refer to that certain Credit Agreement ("Credit Agreement"), dated as of April 25, 1998, by
and between PT Indah Kiat Pulp & Paper Corporation Tbk ("Indah Kiat"), as Borrower, Asia
Pulp & Paper Company Limited ("APP"), as Guarantor, and Beloit Corporation ("Beloit"), as

Mr. Ronny Kurniawan
September 14, 2001
Page 2

Lender, as amended, modifed, and supplemented from time to time, and that certain Promiss
Note ("Note"), dated September 24, 1998, in the principal amount of U.S. $26,701,678 made
Indah Kiat payable to the order of Beloit, including the Guarantee of APP executed thereon
("Guarantee"). Capitalized terms used herein without definition shall have the meanings
ascribed to them in the Credit Agreement.

As you will recall, The First National Bank of Chicago, now known as Bank One, NA ("Ban
One"), purchased from Beloit all of Beloit's right, title, and interest in, to, and under the Note
the Credit Agreement, and the Guarantee.

This letter serves as a notice of default in Indah Kiat's obligations under the Credit Agreemen
Indah Kiat failed to pay Bank One a mandatory payment of principal and interest on the Note
and the Loans due on April 2, 2001 and has not rectified the default. Under § 7.1 of the Credi
Agreement, such failure to pay constitutes an Event of Default.

Under the Note, such failure to pay automatically matured the whole amount of the unpaid
principal of and accrued interest on the Note, and such amount is now immediately due and
payable in full to Bank One. In addition, pursuant to § 7.1 of the Credit Agreement, Bank On
hereby declares all unpaid principal of and accrued interest on the Note and all other amounts
due in respect of the Loans or the Credit Agreement to be immediately due and payable in full
Bank One. Pursuant to the Note and the Credit Agreement, default interest is now accruing on
all outstanding amounts at the rate of LIBOR plus 3.125%.

Other Events of Default may exist of which we may not be aware; this letter is not intended to
an exhaustive or all-inclusive listing of all Events of Default which may exist at this time. Ba
One reserves its right to recognize and notify you of additional Events of Default as they occu
or as it learns of them.

Bank One reserves its right at any time to take any and all actions, and to exercise any and all
remedies, authorized or permitted under the Credit Agreement or in respect of the Note, or
available at law or equity or otherwise. Bank One does not waive and has not waived any such
rights or remedies by this notice or by its failure to act on this notice or on any Event of Defau
Bank One's failure to exercise, or its delay in exercising, any such rights or remedies in the
future shall not constitute a waiver of such rights or remedies or of any Event of Default. This
notice shall not entitle you to any other or further notice or constitute a waiver of the right to a
other or further action without notice or demand. Any prior or current discussions or course of
conduct between Bank One or its representatives, on the one hand, and Indah Kiat or its
representatives, on the other hand, is not and has not been intended to constitute a waiver of an
such rights or remedies, or to amend or modify the Credit Agreement or the Note. Without
limiting the generality of the foregoing, neither this paragraph nor anything else in this letter is

Mr. Ronny Kurniawan
September 14, 2001
Page 3

intended to limit, impair, or affect in any way Bank One's rights under, without limitation,
of the Credit Agreement.

Sincerely,

BANK ONE, NA

By: _____

Ronnie Kaplan
[Print name]

Its: First Vice President

cc: Head, Legal Department (Indah Kiat) (by facsimile and registered mail)
Director, Corporate and Legal Affairs(APP) (by facsimile and registered mail)
Mark W. Page

# EXHIBIT N



Managed Assets Department
Telephone:   312.732.2733
Fax:            312.732.1775
E-Mail:       Ronnie_D_Kaplan@bankone.com

Ronnie Kaplan
First Vice President

September 14, 2001

**Via Facsimile and Registered Mail**

Asia Pulp and Paper Company Ltd.
Wisma Indah Kiat, Gedung B. Lantai 4
Jalan Raya Serpong Km. 8
Tangerang 15310, Jawa Berat
Republic of Indonesia
Fax. No. 62-21-334979

Asia Pulp and Paper Company Ltd.
118 Pioneer Road
Singapore 639598
Republic of Singapore
Fax No. 65-477-6557

Attention:  Messrs. T.G. Widjaya and Hendrik Tee

Re:     Notice of Default (Guarantee of Loan to PT Indah Kiat Pulp and Paper
         Corporation Tbk)

Dear Messrs. Widjaya and Tee:

Reference is made to that certain Credit Agreement ("Credit Agreement"), dated as of April 25,
1998, by and between PT Indah Kiat Pulp and Paper Corporatiojn Tbk ("Indah Kiat"), as
Borrower, Asia Pulp & Paper Company Limited ("APP"), as Guarantor, and Beloit Corporation
("Beloit"), as Lender, as amended, modifed, and supplemented from time to time, and that
certain Promissory Note ("Note"), dated September 24, 1998, in the principal amount of U.S.
$26,701,678 made by Indah Kiat payable to the order of Beloit, including the Guarantee of APP

Messrs. T.G. Widjaya and Hendrik Tee
September 14, 2001
Page 2

executed thereon ("Guarantee"). Capitalized terms used herein without definition shall have the meanings ascribed to them in the Credit Agreement.

As you will recall, The First National Bank of Chicago, now known as Bank One, NA ("Bank One"), purchased from Beloit all of Beloit's right, title, and interest in, to, and under the Note, the Credit Agreement, and the Guarantee.

This letter serves as a notice of default in APP's obligations under § 3 of the Credit Agreement and the Guarantee. A mandatory payment of principal of and interest on the Note and the Loans due on April 2, 2001 was not made. APP's failure to make that payment constitutes a default in its obligations under § 3 of the Credit Agreement and the Guarantee.

Under the Note, the failure to make the April 2 payment automatically matured the whole amount of the unpaid principal of and accrued interest on the Note, and such amount is now immediately due and payable in full to Bank One. In addition, pursuant to § 7.1 of the Credit Agreement, Bank One has declared all unpaid principal of and accrued interest on the Note and all other amounts due in respect of the Loans or the Credit Agreement to be immediately due and payable in full to Bank One. A copy of the notice of default is enclosed. Pursuant to the Note and the Credit Agreement, default interest is now accruing on all outstanding amounts at the rate of LIBOR plus 3.125%. Under § 3 of the Credit Agreement and the Guarantee, APP is obligated to pay Bank One immediately all amounts now due and payable under the Note and the Credit Agreement.

Bank One reserves its right at any time to take any and all actions, and to exercise any and all remedies, authorized or permitted under the Credit Agreement or in respect of the Note or Guarantee, or available at law or equity or otherwise. Bank One does not waive and has not waived any such rights or remedies by this letter or by its failure to act on this letter or on any Event of Default. Bank One's failure to exercise, or its delay in exercising, any such rights or remedies in the future shall not constitute a waiver of such rights or remedies or of any Event of Default. This letter shall not entitle you to any other or further notice or constitute a waiver of the right to any other or further action without notice or demand. Any prior or current discussions or course of conduct between Bank One or its representatives, on the one hand, and APP or its representatives, on the other hand, is not and has not been intended to constitute a waiver of any such rights or remedies, or to amend or modify the Credit Agreement, the Note, or the Guarantee. Without limiting the generality of the foregoing, neither this paragraph nor anything else in this letter is intended to limit, impair, or affect in any way Bank One's rights under, without limitation, § 3.2 of the Credit Agreement.

Messrs. T.G. Widjaya and Hendrik Tee
September 14, 2001
Page 3

Sincerely,

BANK ONE, NA

By: _Ri Kpl_

_Ronnie Kaplan_
[Print name]

Its: _First Vice President_

Enclosure
cc:    Director, Corporate and Legal Affairs (APP) (by facsimile and registered mail)
       Mark W. Page



**Managed Assets Department**
Telephone:  312.732.2733
Fax:            312.732.1775
E-Mail:       Ronnie_D_Kaplan@bankone.com

**Ronnie Kaplan**
First Vice President

September 14, 2001

**Via Facsimile and Registered Mail**

PT Indah Kiat Pulp & Paper Corporation Tbk
Wisma BII Jalan MH Thamrin Kav 22
Jakarta, Pusat 01350
Republic of Indonesia

PT Indah Kiat Pulp & Paper Corporation Tbk
Wisma Indah Kiat, Gedung B. Lantai 4B
Jalan Raya Serpong Km 8
Tangerang, 15310 Jawa Barat
Republic of Indonesia
Fax No. 62-21-334979

PT Indah Kiat Pulp & Paper Corporation Tbk
Plaza BII, Tower II, 9th Floor
Jalan M.H. Thamrin No. 51
Jakarta 103050
Republic of Indonesia
Fax No. 62-21-392-6179

Attention:  Mr. Ronny Kurniawan

      Re:  Notice of Default  (Indah Kiat)

Dear Mr. Kurniawan:

We refer to that certain Credit Agreement ("Credit Agreement"), dated as of April 25, 1998, by and between PT Indah Kiat Pulp & Paper Corporation Tbk ("Indah Kiat"), as Borrower, Asia Pulp & Paper Company Limited ("APP"), as Guarantor, and Beloit Corporation ("Beloit), as

Mr. Ronny Kurniawan
September 14, 2001
Page 2

Lender, as amended, modifed, and supplemented from time to time, and that certain Promisso
Note ("Note"), dated September 24, 1998, in the principal amount of U.S. $26,701,678 made
Indah Kiat payable to the order of Beloit, including the Guarantee of APP executed thereon
("Guarantee"). Capitalized terms used herein without definition shall have the meanings
ascribed to them in the Credit Agreement.

As you will recall, The First National Bank of Chicago, now known as Bank One, NA ("Bank
One"), purchased from Beloit all of Beloit's right, title, and interest in, to, and under the Note
the Credit Agreement, and the Guarantee.

This letter serves as a notice of default in Indah Kiat's obligations under the Credit Agreemen
Indah Kiat failed to pay Bank One a mandatory payment of principal and interest on the Note
and the Loans due on April 2, 2001 and has not rectified the default. Under § 7.1 of the Credi
Agreement, such failure to pay constitutes an Event of Default.

Under the Note, such failure to pay automatically matured the whole amount of the unpaid
principal of and accrued interest on the Note, and such amount is now immediately due and
payable in full to Bank One. In addition, pursuant to § 7.1 of the Credit Agreement, Bank One
hereby declares all unpaid principal of and accrued interest on the Note and all other amounts
due in respect of the Loans or the Credit Agreement to be immediately due and payable in full
Bank One. Pursuant to the Note and the Credit Agreement, default interest is now accruing on
all outstanding amounts at the rate of LIBOR plus 3.125%.

Other Events of Default may exist of which we may not be aware; this letter is not intended to
an exhaustive or all-inclusive listing of all Events of Default which may exist at this time. Ban
One reserves its right to recognize and notify you of additional Events of Default as they occur
or as it learns of them.

Bank One reserves its right at any time to take any and all actions, and to exercise any and all
remedies, authorized or permitted under the Credit Agreement or in respect of the Note, or
available at law or equity or otherwise. Bank One does not waive and has not waived any such
rights or remedies by this notice or by its failure to act on this notice or on any Event of Defaul
Bank One's failure to exercise, or its delay in exercising, any such rights or remedies in the
future shall not constitute a waiver of such rights or remedies or of any Event of Default. This
notice shall not entitle you to any other or further notice or constitute a waiver of the right to an
other or further action without notice or demand. Any prior or current discussions or course of
conduct between Bank One or its representatives, on the one hand, and Indah Kiat or its
representatives, on the other hand, is not and has not been intended to constitute a waiver of any
such rights or remedies, or to amend or modify the Credit Agreement or the Note. Without
limiting the generality of the foregoing, neither this paragraph nor anything else in this letter is

Mr. Ronny Kurniawan
September 14, 2001
Page 3


intended to limit, impair, or affect in any way Bank One's rights under, without limitation, §
of the Credit Agreement.

Sincerely,

BANK ONE, NA


By: _Ronnie Kaplan_ (signature)

Ronnie Kaplan
[Print name]

Its: First Vice President

cc:     Head, Legal Department (Indah Kiat) (by facsimile and registered mail)
        Director, Corporate and Legal Affairs(APP) (by facsimile and registered mail)
        Mark W. Page

# EXHIBIT

# O



**Managed Assets Department**
Telephone:    312.732.2733
Fax:          312.732.1775
E-Mail:       Ronnie_D_Kaplan@bankone.com

Ronnie Kaplan
First Vice President

September 14, 2001

<u>**Via Facsimile and Registered Mail**</u>

PT Pabrik Kertas Tjiwi Kimia Tbk
Wisma BII Jalan MH Thamrin Kav 22
Jakarta, Pusat 01350
Republic of Indonesia

PT Pabrik Kertas Tjiwi Kimia Tbk
Wisma Indah Kiat, Gendung B. Lantai 4B
Jalan Raya Serpong Km8
Tangerang 15310, Jawa Barat
Republic of Indonesia
Fax No. 62-21-334979

Attention:  Mr. Ronny Kurniawan

Re:    Notice of Default (Twiji Kimia)

Dear Mr. Kurniawan:

Reference is made to that certain Credit Agreement ("Credit Agreement"), dated as of April 25, 1998, by and between PT Pabrik Kertas Tjiwi Kimia Tbk ("Tjiwi Kimia"), as Borrower, Asia Pulp & Paper Company Limited ("APP"), as Guarantor, and Beloit Corporation ("Beloit"), as Lender, as amended, modifed, and supplemented from time to time, and that certain Promissory Note (the "Note"), dated September 24, 1998, in the principal amount of U.S. $17,123,488.95 made by Tjiwi Kimia payable to the order of Beloit, including the Guarantee of APP executed thereon ("Guarantee"). Capitalized terms used herein without definition shall have the meanings ascribed to them in the Credit Agreement.

Mr. Ronny Kurniawan
September 14, 2001
Page 2

As you will recall, The First National Bank of Chicago, now known as Bank One, NA ("Bank One"), purchased from Beloit all of Beloit's right, title, and interest in, to, and under the Note, the Credit Agreement, and the Guarantee.

This letter serves as a notice of default in Tjiwi Kimia's obligations under the Credit Agreement. Tjiwi Kimia failed to pay Bank One a mandatory payment of principal and interest on the Note and the Loans due on April 2, 2001 and has not rectified the default. Under § 7.1 of the Credit Agreement, such failure to pay constitutes an Event of Default.

Under the Note, such failure to pay automatically matured the whole amount of the unpaid principal of and accrued interest on the Note, and such amount is now immediately due and payable in full to Bank One. In addition, pursuant to § 7.1 of the Credit Agreement, Bank One hereby declares all unpaid principal of and accrued interest on the Note and all other amounts due in respect of the Loans or the Credit Agreement to be immediately due and payable in full to Bank One. Pursuant to the Note and the Credit Agreement, default interest is now accruing on all outstanding amounts at the rate of LIBOR plus 3.125%.

Other Events of Default may exist of which we may not be aware; this letter is not intended to be an exhaustive or all-inclusive listing of all Events of Default which may exist at this time. Bank One reserves its right to recognize and notify you of additional Events of Default as they occur or as it learns of them.

Bank One reserves its right at any time to take any and all actions, and to exercise any and all remedies, authorized or permitted under the Credit Agreement or in respect of the Note, or available at law or equity or otherwise. Bank One does not waive and has not waived any such rights or remedies by this notice or by its failure to act on this notice or on any Event of Default. Bank One's failure to exercise, or its delay in exercising, any such rights or remedies in the future shall not constitute a waiver of such rights or remedies or of any Event of Default. This notice shall not entitle you to any other or further notice or constitute a waiver of the right to any other or further action without notice or demand. Any prior or current discussions or course of conduct between Bank One or its representatives, on the one hand, and Tjiwi Kimia or its representatives, on the other hand, is not and has not been intended to constitute a waiver of any such rights or remedies, or to amend or modify the Credit Agreement or the Note. Without limiting the generality of the foregoing, neither this paragraph nor anything else in this letter is intended to limit, impair, or affect in any way Bank One's rights under, without limitation, § 8.5 of the Credit Agreement.

Mr. Ronny Kurniawan
September 14, 2001
Page 3

Sincerely,

BANK ONE, NA

By: _Ron Kpl_

_Ronnie Kaplan_
[Print name]

Its: _First Vice President_

cc: Head, Legal Department (Tjiwi Kimia) (by facsimile and registered mail)
Director, Corporate and Legal Affairs (APP) (by facsimile and registered mail)
Mark W. Page

# EXHIBIT
# P

Managed Assets Department
Telephone:   312.732.2733
Fax:         312.732.1775
E-Mail:      Ronnie_D_Kaplan@bankone.com



**Ronnie Kaplan**
First Vice President

September 14, 2001

<u>**Via Facsimile and Registered Mail**</u>

Asia Pulp and Paper Company Ltd.
Wisma Indah Kiat, Gedung B. Lantai 4
Jalan Raya Serpong Km. 8
Tangerang 15310, Jawa Berat
Republic of Indonesia
Fax. No. 62-21-334979

Asia Pulp and Paper Company Ltd.
118 Pioneer Road
Singapore 639598
Republic of Singapore
Fax No. 65-477-6557

Attention: Messrs. T.G. Widjaya and Hendrik Tee

Re:     Notice of Default (Guarantee of Loan to PT Pabrik Kertas Tjiwi Kimia Tbk)

Dear Messrs. Widjaya and Tee:

Reference is made to that certain Credit Agreement ("Credit Agreement"), dated as of April 25,
1998, by and between PT Pabrik Kertas Tjiwi Kimia Tbk ("Tjiwi Kimia"), as Borrower, Asia
Pulp & Paper Company Limited ("APP"), as Guarantor, and Beloit Corporation ("Beloit"), as
Lender, as amended, modifed, and supplemented from time to time, and that certain Promissory
Note ("Note"), dated September 24, 1998, in the principal amount of U.S. $17,123,488.95 made
by Tjiwi Kimia payable to the order of Beloit, including the Guarantee of APP executed thereon
("Guarantee"). Capitalized terms used herein without definition shall have the meanings
ascribed to them in the Credit Agreement.

Messrs. T.G. Widjaya and Hendrik Tee
September 14, 2001
Page 2

As you will recall, The First National Bank of Chicago, now known as Bank One, NA ("Bank One"), purchased from Beloit all of Beloit's right, title, and interest in, to, and under the Note, the Credit Agreement, and the Guarantee.

This letter serves as a notice of default in APP's obligations under § 3 of the Credit Agreement and the Guarantee. A mandatory payment of principal of and interest on the Note and the Loans due on April 2, 2001 was not made. APP's failure to make that payment constitutes a default in its obligations under § 3 of the Credit Agreement and the Guarantee.

Under the Note, the failure to make the April 2 payment automatically matured the whole amount of the unpaid principal of and accrued interest on the Note, and such amount is now immediately due and payable in full to Bank One. In addition, pursuant to § 7.1 of the Credit Agreement, Bank One has declared all unpaid principal of and accrued interest on the Note and all other amounts due in respect of the Loans or the Credit Agreement to be immediately due and payable in full to Bank One. A copy of the notice of default is enclosed. Pursuant to the Note and the Credit Agreement, default interest is now accruing on all outstanding amounts at the rate of LIBOR plus 3.125%. Under § 3 of the Credit Agreement and the Guarantee, APP is obligated to pay Bank One immediately all amounts now due and payable under the Note and the Credit Agreement.

Bank One reserves its right at any time to take any and all actions, and to exercise any and all remedies, authorized or permitted under the Credit Agreement or in respect of the Note or Guarantee, or available at law or equity or otherwise. Bank One does not waive and has not waived any such rights or remedies by this letter or by its failure to act on this letter or on any Event of Default. Bank One's failure to exercise, or its delay in exercising, any such rights or remedies in the future shall not constitute a waiver of such rights or remedies or of any Event of Default. This letter shall not entitle you to any other or further notice or constitute a waiver of the right to any other or further action without notice or demand. Any prior or current discussions or course of conduct between Bank One or its representatives, on the one hand, and APP or its representatives, on the other hand, is not and has not been intended to constitute a waiver of any such rights or remedies, or to amend or modify the Credit Agreement, the Note, or the Guarantee. Without limiting the generality of the foregoing, neither this paragraph nor anything else in this letter is intended to limit, impair, or affect in any way Bank One's rights under, without limitation, § 3.2 of the Credit Agreement.

Messrs. T.G. Widjaya and Hendrik Tee
September 14, 2001
Page 3

Sincerely,

BANK ONE, NA

By: _Ronnie Kaplan_

_Ronnie Kaplan_
[Print name]

Its: _First Vice President_

Enclosure
cc:    Director, Corporate and Legal Affairs (APP) (by facsimile and registered mail)
        Mark W. Page



**BANK ONE**

Ronnie Kaplan
First Vice President

Managed Assets Department
Telephone:    312.732.2733
Fax:          312.732.1775
E-Mail:       Ronnie_D_Kaplan@bankone.com

September 14, 2001

**Via Facsimile and Registered Mail**

PT Pabrik Kertas Tjiwi Kimia Tbk
Wisma BII Jalan MH Thamrin Kav 22
Jakarta, Pusat 01350
Republic of Indonesia

PT Pabrik Kertas Tjiwi Kimia Tbk
Wisma Indah Kiat, Gendung B. Lantai 4B
Jalan Raya Serpong Km8
Tangerang 15310, Jawa Barat
Republic of Indonesia
Fax No. 62-21-334979

Attention:  Mr. Ronny Kurniawan

Re:    Notice of Default (Twiji Kimia)

Dear Mr. Kurniawan:

Reference is made to that certain Credit Agreement ("Credit Agreement"), dated as of April 25, 1998, by and between PT Pabrik Kertas Tjiwi Kimia Tbk ("Tjiwi Kimia"), as Borrower, Asia Pulp & Paper Company Limited ("APP"), as Guarantor, and Beloit Corporation ("Beloit"), as Lender, as amended, modifed, and supplemented from time to time, and that certain Promissory Note (the "Note"), dated September 24, 1998, in the principal amount of U.S. $17,123,488.95 made by Tjiwi Kimia payable to the order of Beloit, including the Guarantee of APP executed thereon ("Guarantee"). Capitalized terms used herein without definition shall have the meanings ascribed to them in the Credit Agreement.

Mr. Ronny Kurniawan
September 14, 2001
Page 2

As you will recall, The First National Bank of Chicago, now known as Bank One, NA ("Bank One"), purchased from Beloit all of Beloit's right, title, and interest in, to, and under the Note, the Credit Agreement, and the Guarantee.

This letter serves as a notice of default in Tjiwi Kimia's obligations under the Credit Agreement. Tjiwi Kimia failed to pay Bank One a mandatory payment of principal and interest on the Note and the Loans due on April 2, 2001 and has not rectified the default. Under § 7.1 of the Credit Agreement, such failure to pay constitutes an Event of Default.

Under the Note, such failure to pay automatically matured the whole amount of the unpaid principal of and accrued interest on the Note, and such amount is now immediately due and payable in full to Bank One. In addition, pursuant to § 7.1 of the Credit Agreement, Bank One hereby declares all unpaid principal of and accrued interest on the Note and all other amounts due in respect of the Loans or the Credit Agreement to be immediately due and payable in full to Bank One. Pursuant to the Note and the Credit Agreement, default interest is now accruing on all outstanding amounts at the rate of LIBOR plus 3.125%.

Other Events of Default may exist of which we may not be aware; this letter is not intended to be an exhaustive or all-inclusive listing of all Events of Default which may exist at this time. Bank One reserves its right to recognize and notify you of additional Events of Default as they occur or as it learns of them.

Bank One reserves its right at any time to take any and all actions, and to exercise any and all remedies, authorized or permitted under the Credit Agreement or in respect of the Note, or available at law or equity or otherwise. Bank One does not waive and has not waived any such rights or remedies by this notice or by its failure to act on this notice or on any Event of Default. Bank One's failure to exercise, or its delay in exercising, any such rights or remedies in the future shall not constitute a waiver of such rights or remedies or of any Event of Default. This notice shall not entitle you to any other or further notice or constitute a waiver of the right to any other or further action without notice or demand. Any prior or current discussions or course of conduct between Bank One or its representatives, on the one hand, and Tjiwi Kimia or its representatives, on the other hand, is not and has not been intended to constitute a waiver of any such rights or remedies, or to amend or modify the Credit Agreement or the Note. Without limiting the generality of the foregoing, neither this paragraph nor anything else in this letter is intended to limit, impair, or affect in any way Bank One's rights under, without limitation, § 8.5 of the Credit Agreement.

Mr. Ronny Kurniawan
September 14, 2001
Page 3

Sincerely,

BANK ONE, NA

By: _____

    Ronnie Kaplan
    [Print name]

Its: First Vice President

cc:    Head, Legal Department (Tjiwi Kimia) (by facsimile and registered mail)
       Director, Corporate and Legal Affairs (APP) (by facsimile and registered mail)
       Mark W. Page